535 F.2d 257
 12 Fair Empl.Prac.Cas. 314,
11 Empl. Prac. Dec. P 10,728
John PATTERSON et al., Appellees,
v.
The AMERICAN TOBACCO COMPANY, a Division of American Brands,
Incorporated, Appellant.
John PATTERSON et al., Appellees,
v.
TOBACCO WORKERS' INTERNATIONAL UNION, an unincorporated
association and Local 182, Tobacco Workers'
International Union, an unincorporated
association, Appellants.
John PATTERSON et al., Appellants,
v.
The AMERICAN TOBACCO COMPANY, a Division of American Brands,
Incorporated, et al., Appellees.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellee,
v.
LOCAL 182, TOBACCO WORKERS' INTERNATIONAL UNION (AFL-CIO),
Appellant.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellee,
v.
AMERICAN BRANDS, INC., d/b/a American Tobacco Company, Inc.,
Appellant.
 Nos. 75-1259 to 75-1263.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1975.
Decided Feb. 23, 1976.
 
 Henry L. Marsh, III, Richmond, Va. (S. W. Tucker, John W. Scott, Jr., Randall G. Johnson, Hill, Tucker & Marsh, Richmond, Va., Jack Greenberg, Elaine R. Jones, Barry L. Goldstein, and Morris J. Baller, New York City, on brief), for John Patterson, and others.
 Henry T. Wickham, Richmond, Va. (John F. Kay, Jr., Kenneth V. Farino, Mays, Valentine, Davenport & Moore, Richmond, Va., Chadbourne, Parke, Whiteside & Wolff, Paul G. Pennoyer, Jr., Arnold Henson, Bernard W. McCarthy, and Bernard J. Dushman, New York City, on brief), for The American Tobacco Co. and American Brands, Incorporated.
 Herbert L. Segal, Louisville, Ky. (Irwin H. Cutler, Jr., Walter Lapp Sales, Segal, Isenberg, Sales & Stewart, Louisville, Ky., Jay J. Levit, Stallard & Levit, Richmond, Va., and James F. Carroll, Washington, D. C., on brief), for Tobacco Workers' International Union and Local 182.
 Margaret C. Poles, Atty., Equal Employment Opportunity Commission, Washington, D. C. (Julia P. Cooper, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, and Beatrice Rosenberg and Charles L. Reischel, Attys., Washington, D. C., on brief), for the Equal Employment Opportunity Commission.
 Before WINTER, BUTZNER and WIDENER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 These appeals and cross appeals question certain provisions of a judgment entered in consolidated actions brought by the Equal Employment Opportunity Commission and several black employees of the American Tobacco Co. against the company, the Tobacco Workers' International Union, and its Local 182. The case concerns the application of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and 42 U.S.C. § 1981 to redress race and sex discrimination in working conditions.[1] Following is a summary of the district court's decision and our disposition of the assignments of error:
 
 
 2
 I. The district court defined the class of black employees as those, whether currently employed or not, who worked on or after July 2, 1965, the date Title VII became effective. It found no discrimination in hiring but ruled that the company and the labor organizations had engaged in unlawful employment practices by racial discrimination in the promotion of employees. It ordered American to institute company-wide seniority, eliminate certain lines of progression from lower to higher paying jobs, post definite job descriptions, grant back pay, and adjust pensions and profit sharing plans in amounts to be determined at a subsequent hearing. The court also ordered that white incumbents be bumped from jobs for which senior black employees were qualified.
 
 
 3
 Neither party has assigned error to the court's finding of no discrimination in hiring. We find no error in the designation of the class. We affirm the finding of discrimination in promotions and approve the relief ordered by the court, except for provisions of the judgment dealing with company-wide seniority and bumping.
 
 
 4
 II. The district court ruled that the EEOC was empowered to bring suit to eliminate discrimination against women, although the initial charge dealt only with discrimination against men. It defined the class of aggrieved women in terms similar to those used to describe the class of black employees. The court found discrimination in promotions but not in hiring, and it ordered relief similar to that afforded black employees.
 
 
 5
 On these issues we affirm the district court, modifying only its grant of relief.
 
 
 6
 III. The district court found discrimination in the selection of supervisors and ordered the company to prepare written job descriptions and objective criteria for appointments. It also ordered preferential hiring of blacks and women to fill supervisory vacancies.
 
 
 7
 We affirm these aspects of the court's judgment except for those dealing with preferential hiring.
 
 
 8
 IV. The district court held that the actions were timely filed, that the statute of limitations for an action brought under § 1981 is five years, and that the statute is not tolled by filing a charge with the EEOC. It also held that back pay for discrimination against women should accrue from two years before the charge was filed.
 
 
 9
 Except for the application of the five-year statute of limitations and the accrual of liability for the women's back pay, we affirm these rulings. The proper limitation, we hold, is two years, and the accrual date for back pay must be reexamined in light of EEOC v. General Electric Co., 532 F.2d 359 (4th Cir. 1975), which was decided after the district court wrote its opinion.
 
 
 10
 * American operates three facilities in Richmond, Virginia. The "Virginia Branch" makes cigarettes; the "Richmond Branch" makes pipe tobacco; and the "Richmond Office" keeps accounts and records for both branches. Approximately 250 of the 1,280 employees at both branches are black, and in the Richmond office 13 of the 62 employees are black. In each branch the prefabrication department blends and prepares tobacco before sending it to the fabrication department, which manufactures the finished products. Workers in prefabrication generally earn less than those in fabrication, and most employees at the Richmond branch make less than those at the Virginia branch.
 
 
 11
 Before 1963 the union and the company overtly segregated employees by race with respect to job assignments, cafeterias, restrooms, lockers, and plant entrances. White employees were represented by Local 182 of the Tobacco Workers' International Union, while black employees were represented by Local 216. Blacks were generally assigned to positions in the prefabrication departments. The higher paying jobs in fabrication were largely reserved for white employees. Each department had its own seniority roster, on which promotions depended. Employees could not transfer from one department to another without forfeiting their seniority.
 
 
 12
 In September 1963 the black union was assimilated by the white Local 182 to comply with an executive order relating to the government's purchase of supplies. Simultaneously, the company abolished departmental seniority, but it continued to maintain separate rosters at the two branches. The 1963 changes did not eliminate racial discrimination from the company's promotion practices. The district court found that until 1968 the company utilized a system of unwritten qualifications which denied black employees access to the higher paying jobs at the Virginia branch. For certain positions an employee had to be familiar with the duties of the new job in the opinion of his supervisor. Also, he had to work a minimum number of hours on a temporary basis to qualify as an operator of a making or packing machine. Consequently, black employees not working in proximity to the higher paying jobs had limited opportunity to qualify, regardless of their seniority. Combined with static employment in the tobacco industry, this system allowed little advancement of black employees from jobs in prefabrication to those in fabrication. Indeed, from 1963 to 1968 there was an increase of only four blacks in the fabrication department at the Virginia branch.
 
 
 13
 The Richmond branch had no qualification restrictions on promotions. Instead, supervisors canvassed employees, seeking the senior worker willing to fill a vacancy. There were, however, no written job descriptions. This system provided slight opportunity for black employees to move from prefabrication to fabrication, and from 1963 to 1968 there was an increase of only six black employees in the latter department. As of 1968, only three of the 26 machine operators were black.
 
 
 14
 In January 1968 the company discontinued its qualifications system. Instead, it posted vacancies and promoted the senior employee who bid for the job. The district court found that this innovation was "facially fair and neutral" but ordered that it be implemented by posting written job descriptions. Furthermore, the district court found that access to certain jobs was barred to black employees by lines of progression and the maintenance of separate seniority rosters for each branch.
 
 
 15
 Although the company and the union have taken steps in recent years to correct some of the inequalities of the past, the lines of progression, the lack of definite written job descriptions, and barriers to transfer between the branches remain impediments to fair and neutral employment practices. Much must still be done to eradicate any taint of racial discrimination at the plant. The most recent figures available indicate that as of the end of 1973, more than 80 percent of all the employees in the Virginia branch's prefabrication department were black, while in the fabrication department only about 14 percent were black. At the Richmond branch, black employees' penetration into the fabrication department was greater, with blacks comprising more than 38 percent of the workforce. But the lower paying prefabrication department remained almost completely segregated; 92 percent of its employees were black. These figures provide ample support for the district court's findings that "(t)raditionally, at both branches there have been more blacks in the prefabrication department than whites, and more whites in the fabrication department than blacks."
 
 
 16
 The company emphasizes that from July 2, 1964, to March 1, 1974, 25 percent of all employees promoted and 20 percent of those advanced to operate automatic machinery at the Virginia branch were black. Also, since the initiation in January 1968 of the posting and bidding procedure, 51.5 percent of the successful bidders have been black. These gross figures, however, include promotions in both prefabrication and fabrication departments, and, while laudable, they do not address the crucial issue of the case the entry of black employees into the historically white fabrication department. Apart from the fact that many of these promotions were made after charges were filed with the EEOC, the company's reliance on the overall promotion rate in both departments misses the mark because blacks have always been promoted in the historically black prefabrication department. Moreover, as late as 1973, of the approximately 200 hourly-paid, non-craft job classifications at Virginia, 18 had never been held by whites and 10 had never been held by blacks. Even more rigid segregation characterized the Richmond branch; of the approximately 43 hourly-paid, non-craft job classifications, 21 had never been held by whites and nine had never been held by blacks.
 
 
 17
 We conclude, therefore, that the record amply supports the district court's finding that after the effective date of Title VII the company and the union discriminated in the promotional policies of their bargaining agreements and practices. Tested by familiar standards, the court's findings must be sustained.[2]
 
 
 18
 We next consider the assignments of error that challenge the relief ordered by the district court. The directive that definite job descriptions must be provided in order to implement a fair method of promotion was clearly warranted. Cf. Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir. 1972).
 
 
 19
 In those jobs that were filled according to lines of progression, an employee had to work in the first job before proceeding to the next, and so on up to the highest job in the line. Most of these jobs were in the fabrication departments. Since black employees had been largely excluded from the fabrication departments, they held few jobs in most of these lines and could not advance despite their seniority. In this respect, the lines of progression perpetuated the effects of past discrimination in a manner similar to the formerly segregated departmental seniority rosters. On the basis of its evaluation of conflicting expert testimony, the district court held that only three of the nine lines are justified by business necessity.[3] For the others, alternative means such as on-the-job training are available to provide competent workers.
 
 
 20
 Addressing the discrimination caused by lines of progression, we pointed out in Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir. 1971), that the vagaries of chance inherent in this promotion system might bar a qualified worker from advancement for years, although he could learn to perform the job competently in a relatively short time. To deal with such situations, we formulated the following standard for ascertaining whether a condition of employment was justified by business necessity:
 
 
 21
 "(T)he applicable test is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact." 444 F.2d at 798.
 
 
 22
 Measured by this test, the district court's elimination of the six lines of progression was correct.
 
 
 23
 The district court also ordered a single seniority roster for the Virginia and Richmond branches to enable employees in each branch to bid for posted jobs in the other. The order is designed to correct the present effect of past discrimination, which denied black employees entry into the higher paying jobs of the fabrication departments, particularly at the Virginia branch. For example, under the present method of job assignments, a black employee hired in 1955 at the Richmond branch prefabrication department has no realistic opportunity to secure a higher paying job in the formerly white Virginia fabrication department because he cannot transfer his company seniority to the Virginia branch. If he seeks a new job there, he must forfeit his seniority and start as a new hire.
 
 
 24
 The district court correctly found that the denial of transfer between the branches without retention of company seniority perpetuates the effect of past discrimination. We believe, however, that the relief ordered by the district judge is broader than necessary. Title VII does not require the company or the union to forego the benefits of separate, nondiscriminatory seniority rosters. "Application of the Act normally involves two steps. First, identification of the employees who are victims of discrimination, and second, prescription of a remedy to correct the violation disclosed by the first step. The Act does not require the application of the remedy to employees who are not subject to discrimination." United States v. Chesapeake and Ohio Ry., 471 F.2d 582, 593 (4th Cir. 1972). The only employees who suffered discrimination were blacks who could not obtain jobs in the fabrication departments because of their race. Consequently, they are the only employees who should be allowed to transfer under the posting and bidding system from one branch to the fabrication department in the other branch on the basis of their company seniority. Black employees need not be allowed to transfer with company seniority to jobs in prefabrication, because they were never barred from these jobs in the first place. Similarly, white employees seeking transfers are not entitled to utilize company seniority, because they were never barred from fabrication departments. Finally, no employee hired after the cessation of discrimination in job assignments need be allowed to transfer with seniority intact. See, e.g., Russell v. American Tobacco Company, 528 F.2d 357 (4th Cir. 1975); Robinson v. Lorillard Corp.,444 F.2d 791 (4th Cir. 1971); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968).
 
 
 25
 The company and the union assert that this case is distinguishable from departmental seniority cases like Robinson because the Richmond and Virginia branches are in different locations. They emphasize that the branches make different products, have different managements, hire separately, and are some distance apart. For these reasons, they argue, the case falls within 42 U.S.C. § 2000e-2(h), which provides that:
 
 
 26
 "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ."
 
 
 27
 Noting that neither the Act nor the regulations define the statutory term "employees who work in different locations," we recently construed § 2000e-2(h) in Russell v. American Tobacco Co., 528 F.2d 357 (4th Cir. 1975). We pointed out that the labor market is the most important factor in determining whether a company's employees work in different locations. A company operating two or more of its plants with employees who are from the same geographic area and who are unskilled or possess the same skills can assign an applicant to an entry level position in either plant. Therefore, employees the company hired from the same labor market would not generally fall within the statutory class of "employees who work in different locations."
 
 
 28
 On the other hand, even though a company's plants are in the same city, as they are here, their proximity does not conclusively show that they are in the same location. If one plant requires labor possessing skills different from those of workers at another plant, the company cannot draw from the same labor market to man its plants. Under these circumstances, employees would work at different locations, even though they reside and work in the same geographic area.
 
 
 29
 American hires employees for both branches from the same labor market. The branches are only a few city blocks apart. There are entry level jobs at both places that require neither particular skills nor experience, and jobs in fabrication can be filled just as well by transferees as by persons hired off the street.
 
 
 30
 Other facts support the district court's finding that these plants are not in different locations. The same bargaining agreement covers employees at both plants, and the company has contractually reserved the right to shift employees from one plant to the other without depriving them of seniority. The Richmond office, located in a building at the Virginia branch, serves both branches, and the Virginia branch ships the Richmond branch's products.
 
 
 31
 There is another reason why the exemption granted in § 2000e-2(h) is not available to American. As we noted in Russell, supra, 528 F.2d at 363, that section contains a proviso that restricts its application to situations where differences in the conditions of employment "are not the result of an intention to discriminate." Past intentional segregation that is perpetuated by a company's seniority system precludes it from claiming that its system is bona fide within the meaning of § 2000e-2(h), Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971). Similarly, "when present differences in working conditions are remnants of past intentional discrimination, the proviso of § 2000e-2(h) bars a company from defending its employment practices on the ground that its employees 'work in different locations.' " Russell v. American Tobacco Co., 528 F.2d 357, 363 (4th Cir. 1975).
 
 
 32
 We therefore affirm the district court on this issue but note that on remand it should vacate the provision of its judgment requiring a single seniority roster for both branches. It should substitute an order allowing those black employees who formerly could not obtain jobs in the fabrication departments because of discrimination to utilize their company seniority to bid for such jobs in the fabrication department of either branch. Of course, an employee who transfers must have the capacity to perform the job after receiving a reasonable amount of training.
 
 
 33
 The company and the union also assign error to the part of the district court's order that allowed senior black and female employees to bump junior employees from preferred jobs. The court ordered immediate company-wide posting and bidding on each non-supervisory job in the Richmond and Virginia branches. The only qualifications for advancement were to be seniority and a willingness to learn the job. To facilitate the bidding, the court ordered that job descriptions be posted. It further provided that employees who were displaced by senior black or female workers, and therefore had to move to lower paying jobs, must be paid as much as they were in their former jobs. The court explained the reason for this provision of its decree as follows:
 
 
 34
 "The present system of posting and bidding adopted in 1968 is fair, although it needs, in the Court's view, further implementation. As indicated in the findings of fact, however, black and female employees in the Richmond Branch and the Virginia Branch have been locked in their jobs as a result of prior discriminatory practices. This is because of the static condition of the tobacco industry generally, and American in particular, and the advent of automation, both of which have limited opportunities for upward movement of present employees and for new hiring." (Appendix at 37-38.)
 
 
 35
 The court's description of the lack of employment opportunities is well supported by the evidence. No new employees were hired to fill jobs under jurisdiction of the union from September 12, 1955, through June 12, 1964, in the Richmond branch and May 12, 1966, in the Virginia branch. Employment in both branches decreased from 1953 to 1973 by approximately 1300 workers.
 
 
 36
 One of the early questions about the construction of Title VII was whether "present consequences of past discrimination (are) covered by the act." Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 510 (E.D.Va.1968). The generally accepted answer is a qualified "yes": employers and unions using pre-Act discriminatory practices to bar employees from filling post-Act vacancies violate the Act. Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); Quarles, supra. On the other hand, Title VII has not been construed to impose a duty to demote incumbents. In Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), the court rejected the contention that "allowing junior whites to continue in their jobs constitutes an act of discrimination." Judge Wisdom, writing for the court, said:
 
 
 37
 "The Act should be construed to prohibit the future awarding of vacant jobs on the basis of a seniority system that 'locks in' prior racial classification. White incumbent workers should not be bumped out of their present positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation." 416 F.2d at 988.
 
 
 38
 Every appellate court to whom the issue has been presented has accepted this interpretation.[4] Equally important, when Congress was considering the 1972 amendments to Title VII, it approvingly noted Papermakers' construction of the Act.[5]
 
 
 39
 These precedents cannot be satisfactorily distinguished on the ground that bumping would be required only when the proof discloses a static industry that has few vacancies. The difference between static and dynamic industries is not always readily ascertainable because employment opportunities fluctuate for many reasons over long and short periods. Requiring bumping for static industries while denying it in dynamic industries would introduce into the administration of the Act countless variables for which Congress has made no provision.
 
 
 40
 Since the Act should not be applied retroactively,[6] it is, of course, much easier to justify the retention of incumbents who obtained their positions before the effective date of the Act than the retention of those who were unlawfully preferred after this date. Nevertheless, neither Congress nor the EEOC nor the courts have drawn a distinction between pre-Act and post-Act incumbents. The reasons for applying the Act uniformly are largely pragmatic. The enactment of Title VII was the result of many concessions, including the unequivocal assertion by proponents of the legislation that it was not intended to be used to displace incumbent workers.[7] A primary goal of Title VII is to induce voluntary compliance by employers and unions. Section 2000e-5; see EEOC v. Hickey-Mitchell Co., 507 F.2d 944, 948 (8th Cir. 1974). Demoting employees, especially those who are not responsible for wrongdoing, undoubtedly would encounter more resistance than deferring their future expectancies. As this case illustrates, bumping is an unsettling process. Its domino effect adversely affects employees who have done no wrong and who, indeed, may have been the victims of discrimination.[8]
 
 
 41
 The effects of bumping are exacerbated by another aspect of Title VII. The Act does not provide a definitive catalogue of unlawful employment practices. Congress placed this responsibility on the EEOC and, ultimately, the courts. It soon became obvious that overt discrimination is not the only obstacle to equal employment opportunity.[9] As a result of litigation, many "practices, procedures, or tests neutral on their face, and even neutral in terms of intent" have been exposed as discriminatory and condemned. See Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 163 (1971); United States v. Dillon Supply Co., 429 F.2d 800, 804 (4th Cir. 1970). There is no reason to suppose that this process will soon abate. Bumping could mean that employers and workers would likely have their businesses and their working lives rearranged by court decrees from time to time, as various unlawful employment practices are identified. See generally Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1274-75 (1967).
 
 
 42
 Finally, although Congress did not intend the Act to be used as a vehicle for displacing incumbents, it did not leave the victims of discrimination without a remedy. Section 2000e-5(g) expressly authorizes a district court to award them back pay. While an employee who has been unlawfully denied a promotion must await a vacancy before advancing, he need not prove that a vacancy exists in order to qualify for back pay. Hairston v. McLean Trucking Co., 520 F.2d 226 (4th Cir. 1975); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971).
 
 
 43
 In Albemarle Paper Co. v. Moody, 422 U.S. 405, 408, 95 S.Ct. 2362, 2367, 45 L.Ed.2d 280, 291 (1975), the Court explained the standards a district court should follow in awarding back pay to employees who "have lost the opportunity to earn wages because an employer has engaged in an unlawful discriminatory employment practice." The Court said that the back pay provision must be applied in a manner that is "consonant with the twin statutory objectives" of "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." 422 U.S. at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 299.
 
 
 44
 To satisfy these objectives, back pay must be allowed an employee from the time he is unlawfully denied a promotion, subject to the applicable statute of limitations, until he actually receives it. Some employees who have been victims of discrimination will be unable to move immediately into jobs to which their seniority and ability entitle them. The back pay award should be fashioned to compensate them until they can obtain a job commensurate with their status. This may be accomplished by allowing back pay for a period commencing at the time the employee was unlawfully denied a position until the date of judgment, subject to the applicable statute of limitations. This compensation should be supplemented by an award equal to the estimated present value of lost earnings that are reasonably likely to occur between the date of judgment and the time when the employee can assume his new position. See Bush v. Lone Star Steel Co., 373 F.Supp. 526, 538 (E.D.Tex. 1974); United States v. United States Steel Corp., 371 F.Supp. 1045, 1060 n. 38 (N.D.Ala.1973), modified on other grounds United States v. United States Steel Corp., 520 F.2d 1043 (5th Cir. 1975).[10] Alternatively, the court may exercise continuing jurisdiction over the case and make periodic back pay awards until the workers are promoted to the jobs their seniority and qualifications merit. Or perhaps counsel and the court can devise some other convenient method of taking all the effects of past discrimination into account. In any event, the compensation must include, as the district court properly noted, increments for pensions and profit sharing.
 
 
 45
 Compensatory pay and adjustment of benefits provide monetary relief for discrimination against minority employees but do not afford the satisfaction that comes from being promoted to a more responsible job. Nevertheless, such an intangible benefit does not justify injunctive relief mandating bumping. Weighed against a minority employee's sense of achievement are the harm that demotion will cause to incumbents who have done no wrong and the disruption of the company's business that bumping entails. The survey of employees referred to in footnote 8, supra, indicates that 39 minority employees are seeking jobs held by 8 white men and 31 other minority employees. This survey, however, does not prove that the employees seeking different jobs were motivated even in part by non-monetary factors, for it was conducted on the assumption that bumping was the only way they could receive better pay and fringe benefits. Since full monetary compensation and the removal of barriers to promotion provide adequate relief to minority employees without disruption to other employees and management, we conclude that neither Title VII nor its legislative history requires bumping in this case.
 
 
 46
 Relief under § 1981 is limited to correcting racial discrimination. See Delavigne v. Delavigne, 530 F.2d 598 (4th Cir. 1976); Willingham v. Macon Telegraph Publishing Co., 482 F.2d 535, 537 n. 1 (5th Cir. 1973). But apart from this, Title VII and § 1981 provide complementary remedies for employment discrimination, Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 459-60, 95 S.Ct. 1716, 1719-1720, 44 L.Ed.2d 295, 301-302 (1975). Although the legislative history of Title VII cannot support a decision that bumping relief is unavailable under § 1981, the pragmatic considerations we advance apply with equal force to the § 1981 claim. Moreover, "in fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under Title VII for direction." Waters v. Wisconsin Steel Works of International Harvester Co., 502 F.2d 1309, 1316 (7th Cir. 1974). For these reasons, we hold that bumping relief is not available to American's black employees under § 1981.
 
 
 47
 On remand, therefore, the district court should modify its decree to eliminate bumping, but it should take steps to assure that back pay will be computed to include compensation for the entire time that a minority employee is denied a promotion for which he or she is qualified by seniority and ability.
 
 
 48
 We affirm the district court's award of relief against both the local and the International, except as noted in Part II. The local acquiesced without protest in the lines of progression. Not until 1968 did it negotiate for the removal of the qualification requirements for promotion. In 1968, 1971, and 1974, it proposed a company-wide seniority system that would have allowed transfers between branches. When the company declined, the union settled for assurances of indemnity that would protect its treasury against the claims of its members.
 
 
 49
 A union may not bargain away minority employees' rights to equal treatment, see Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir. 1971), and, indeed, it must "negotiate actively for nondiscriminatory treatment" of its minority workers. Macklin v. Spector Freight Systems, Inc.,156 U.S.App.D.C. 69, 478 F.2d 979, 989 (1973); see also United States v. N. L. Industries, Inc., 479 F.2d 354, 379 (8th Cir. 1973). The Supreme Court has recently emphasized the duty a union owes to its minority members by pointing out that one of the purposes of a back pay award is to spur unions, as well as employers, to evaluate employment practices and eliminate unlawful discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-18, 95 S.Ct. 2362, 2371-2372, 45 L.Ed.2d 280, 296-297 (1975). Tested by these principles, the district court's imposition of liability on both the local and the International was warranted by the law and the facts.
 
 
 50
 Nor can we accept the International's argument that it should not be held liable because it was not responsible for the contracts negotiated by the local. The evidence disclosed that a vice president of the International acted as an "advisor" to the local, playing an active role as the president's deputy in the 1971 and 1974 negotiations for bargaining agreements. Moreover, the constitution of the International provides:
 
 
 51
 "It shall be the principal duty of the Local Union to secure satisfactory collective bargaining and working agreements showing an adequate minimum wage and fair working conditions for workers who have become affiliated with the TWIU, provided, however, that no collective bargaining and working agreement shall be consummated until first submitted to the general president who may approve or reject any proposed agreement, and no such agreement can be executed without the approval of the general president or his deputy."
 
 
 52
 The district court was not obliged to accept representations of the vice president that contradicted the plain meaning of this provision. The court properly concluded that the International's approval of the bargaining agreement pursuant to this provision made it jointly responsible with the local. Cases dealing with an international union's exoneration of liability to an employer are inapposite where its duties to members of its local unions are at issue.
 
 II
 
 53
 The EEOC's complaint contains allegations of discrimination against women employees. The company contends that the commission lacked authority to press this claim because no female employee filed a charge. On the contrary, the company points out, the only charge of sex discrimination was filed by a male employee. The district court overruled the company's motion to dismiss this aspect of the case, holding that the commission could institute the suit if its investigation of the male employee's complaint disclosed discrimination against women.
 
 
 54
 We affirm the district court. We recently decided this issue adversely to the company's position in EEOC v. General Electric Co., 532 F.2d 359 (4th Cir. 1975). The company's argument does not persuade us to depart from the conclusions reached in that case.[11]
 
 
 55
 On the merits of the claim of sex discrimination, we uphold the district court's finding of liability. Because the company's discrimination against women bears many similarities to its discrimination against black employees, we need not recite the evidence in detail. It is sufficient to note that for many years the company overtly segregated jobs by sex, discriminating against women, as the district court found, "with respect to wage structure, departments, seniority and hiring." Even after these practices were nominally eliminated in 1963, their discriminatory effect was perpetuated by lack of definite job descriptions, lines of progression, and obstacles to transfers. The court found that as recently as 1973, 23 of the approximately 200 non-craft, hourly-paid jobs at the Virginia branch had not been held by women, and six had not been held by men. At the Richmond branch, 32 of the 43 non-craft, hourly-paid jobs had not been held by women, and six had not been held by men. The company has not demonstrated that these segregated positions cannot be filled by persons of the opposite sex. The court also found that from 1967 through 1972 women had a lower mean income than men with comparable seniority.
 
 
 56
 Again, the district court's findings are supported by the evidence and cannot be set aside as clearly erroneous. The relief the court afforded women is essentially the same as the relief it granted black employees. Accordingly, we approve the relief for women employees, subject, however, to the same modifications of the court's decree that we mentioned in Part I. This relief, however, can be granted only against the company. The complaint against the union for sex discrimination must be dismissed for reasons we will next discuss.
 
 
 57
 The commission's complaint names the company and Local 182 as defendants. The commission acknowledged that it had not attempted to conciliate the charges with the union before filing suit. While the suit was pending, it made an offer to conciliate, which the union accepted. In the course of discussion with the union, however, the commission's representative conceded that he had no authority to settle the suit. Understandably, the conciliation efforts were unsuccessful. The district court, viewing the lapse as technical, held that the belated offer to conciliate and its acceptance substantially complied with the Act.
 
 
 58
 The Act requires, however, that after receiving a charge and before bringing a suit the commission must take four steps: serve the charge on the employer and labor organization, investigate the charge, determine that reasonable cause exists to believe the charge is true, and endeavor to eliminate alleged unlawful employment practices "by informal methods of conference, conciliation, and persuasion."[12] The 1972 amendments to Title VII empowered the commission to sue if it is unable to secure an acceptable conciliation agreement.[13] This provision of the Act has been construed to create an express condition on the commission's power to sue. Consequently, a suit brought by the commission before attempting conciliation is premature. EEOC v. Hickey-Mitchell Co., 507 F.2d 944, 947-48 (8th Cir. 1974); EEOC v. E. I. DuPont de Nemours & Co., 373 F.Supp. 1321, 1333-34 (D.Del.1974); EEOC v. Westvaco Corp., 372 F.Supp. 985, 991-93 (D.Md.1974).[14]
 
 
 59
 We recently emphasized that the commission's statutory duty to attempt conciliation is among its most essential functions.[15] It is particularly important for the commission to attempt conciliation with a union when investigation discloses that provisions of a bargaining agreement concerning seniority and job assignments are causing the alleged unfair employment practices. Then the employees who enjoy majority status are frequently more directly affected than their employer by changes that will advance minority employees. In such cases, the success of conciliation often hinges on the union's response.
 
 
 60
 We do not rule out the possibility that exceptional circumstances may excuse a failure to attempt conciliation, but that is not the case here. The union's willingness to negotiate even after suit was brought tends to negate any suggestion that timely conciliation of the sex discrimination charges would have been unsuccessful. When it became apparent that the commission's representative lacked authority to settle the case, the possibility of conciliation was dealt a severe blow by the very circumstances Congress sought to avoid commencement of a civil action before attempting conciliation. Accordingly, we conclude that the district court should have dismissed the part of the commission's complaint which alleges that Local 182 caused the company to discriminate unlawfully on the basis of sex.
 
 III
 
 61
 The district court also found that the company had engaged in race and sex discrimination in appointing supervisors. The evidence supports this finding. At both the Richmond and Virginia branches, the entry level position for supervisory personnel is assistant foreman. The company fills about 34 percent of the vacancies in this position by promoting hourly employees; it fills the balance by hiring new applicants. With no formal, objective, written standards for appointment, the company relies in part on recommendations from the union, which also lacks objective standards. Until 1963 the company appointed only white males to supervisory posts, and the enactment of Title VII failed to effect any immediate change in this policy. At the Richmond branch, the first black supervisor was appointed in 1966 and the second in 1971. As of June 1, 1973, there were only three, constituting 9.6 percent of the supervisory force of 31. In 1967 the company named its first female supervisor at the Richmond branch. By 1973 two (6 percent) of the 31 supervisors were women. At the Virginia branch, a black employee was promoted to assistant foreman in 1963. In the next decade four more were appointed, so that by 1973 7.24 percent of the 69 supervisors were black. The first female was not appointed as a supervisor at this branch until 1972. Two more were appointed by June 1, 1973.
 
 
 62
 Before the trial of the case, neither a black employee nor a woman had ever been appointed to a supervisory position at the Richmond office. The court noted, however, that a vacancy existed, and the company proffered additional evidence that as of November 1, 1974, the Richmond office had one black supervisor and one white female supervisor on a staff of eight.
 
 
 63
 The district court enjoined the company from "implementing, maintaining, or giving effect to any criteria utilized for the selection of supervisory personnel which is designed to or has the effect of discriminating against black or female candidates for supervisory positions." It ordered the company to post job descriptions for these positions and to devise objective criteria for selecting new appointees. The propriety of these provisions of the court's decree is well settled. See Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1383 (4th Cir. 1972); Rowe v. General Motors Corp.,457 F.2d 348, 358-59 (5th Cir. 1972). We think, however, that on remand the court's decree should be enlarged to require the union to publish objective criteria for making its recommendations for supervisory appointments.
 
 
 64
 Finally, the district court ordered that vacancies in the assistant foreman, foreman, and office supervisory positions must be filled with qualified blacks and women, except when none can be found, until the percentage of blacks and women equals the percentage of these classes of workers in the Richmond Standard Metropolitan Statistical Area (SMSA). The company's attack on this provision of the decree is two-pronged. First, it contends that Title VII condemns preferential hiring, especially when, as here, the preferences are absolute. It relies primarily on § 703(j) of the Act, 42 U.S.C. § 2000e-2(j), which provides in part:
 
 
 65
 "Nothing contained in this subchapter shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the race . . . (or) sex . . . of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race . . . (or) sex . . . employed . . . in comparison with the total number or percentage of persons of such race . . . (or) sex . . . in any community . . . or in the available work force in any community . . . ."
 
 
 66
 This section plainly bans the use of preferential hiring to change a company's racial imbalance that cannot be attributed to unlawful discrimination. In Griggs v. Duke Power Co., 401 U.S. 424, 430-31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 164 (1971), the Court said:
 
 
 67
 "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."
 
 
 68
 Uniformly, however, Title VII has been construed to authorize district courts to grant preferential relief as a remedy for unlawful discrimination. Rios v. Enterprise Association Steamfitters Local 638 of U. A., 501 F.2d 622, 628-31 (2d Cir. 1974); United States v. N. L. Industries, Inc., 479 F.2d 354, 377 (8th Cir. 1973); Southern Illinois Builders Association v. Ogilvie, 471 F.2d 680, 683-86 (7th Cir. 1972); United States v. Ironworkers Local 86, 443 F.2d 544, 552-53 (9th Cir. 1971); United States v. International Brotherhood of Electrical Workers, Local No. 38, 428 F.2d 144, 149-51 (6th Cir. 1970); Local 53 of International Ass'n of Heat & Frost I. & A. Workers v. Vogler, 407 F.2d 1047, 1053-54 (5th Cir. 1969). This construction of the Act is in harmony with other cases which authorize preferential relief from unlawful employment discrimination in situations where Title VII is not applicable. Associated General Contractors of Massachusetts, Inc. v. Altshuler, 490 F.2d 9, 16-18 (1st Cir. 1973); Carter v. Gallagher,452 F.2d 315, 330 (8th Cir. 1971); Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159, 172, 176-77 (3d Cir. 1971). In all, eight circuits have approved some form of temporary preferential relief for discriminatory employment practices. See Sape, The Use of Numerical Quotas to Achieve Integration in Employment, 16 Wm. & Mary L. Rev. 481, 499 (1975). No court of appeals has ruled to the contrary, although there have been dissents.
 
 
 69
 We have not previously ruled on the issue, but in a case involving the Civil Rights Act of 1866 and the thirteenth and fourteenth amendments, we declined to impose quotas where the district court concluded that adequate relief could be obtained without their use. See Harper v. Kloster, 486 F.2d 1134, 1136 (4th Cir. 1973). In view of the substantial precedent sanctioning preferential relief for unlawful discrimination, we reject the company's argument that Title VII forbids the remedy ordered by the district court. We recognize, however, that cases which approve such remedies caution that the necessity for preferential treatment should be carefully scrutinized and that such relief should be required only when there is a compelling need for it. See Associated General Contractors of Massachusetts, Inc. v. Altshuler, 490 F.2d 9, 17 (1st Cir. 1973). This brings us to the company's second reason for vacating the decree's provision for preferential appointment of supervisors.
 
 
 70
 The company argues that its appointment of black and female employees to supervisory positions already exceeds the ratio that preferential relief would require. Its argument rests on two premises. One, its conduct before the effective date of Title VII does not provide a proper base to measure its compliance with the Act; instead, it must be judged by the manner in which it filled vacancies after this date. Two, the district court erroneously considered the number of blacks and women in the Richmond SMSA workforce as a whole to ascertain a ratio of acceptable performance, instead of using only the blacks and women in the Richmond SMSA supervisory workforce.
 
 
 71
 We believe these premises are well founded. Title VII is not retroactive.[16] It does not provide a remedy for discrimination which occurred before it became effective in 1965. Robinson v. Lorillard Corp.,444 F.2d 791, 795 (4th Cir. 1971). At the Virginia branch 51 of the supervisors were appointed before Title VII prohibited discrimination in their selection. They should not be counted in determining whether preferential hiring is required now. Between 1965 and 1973 the company appointed 18 assistant foremen, the entry level position for supervisors. Of that number, five (27.5 percent) were black and three (16.6 percent) were women. At the Richmond branch, 22 of the supervisors were appointed before Title VII became effective and nine afterwards. Of the nine, three (33.3 percent) were black and two (22 percent) were women. At the Richmond office, the evidence is not as clear. It has six entry level supervisory positions, which at the date of trial were filled by five white males with one vacancy. The district court found that four of the six positions had been filled after 1965. Subsequently, the company proffered evidence that it has promoted one black employee and one female to supervisory positions, constituting for each classification 16.6 percent of the appointments since 1965.[17]
 
 
 72
 The record discloses that 6.8 percent of the blacks and 1.5 percent of the women in the Richmond SMSA are placed in a category that includes supervisory personnel. Those percentages furnish a more realistic measure of the company's conduct than the gross percentage of blacks and women in the whole workforce, including unskilled labor. See Harper v. Mayor, 359 F.Supp. 1187, 1193 n. 5 (D.Md.), aff'd sub nom. Harper v. Kloster, 486 F.2d 1134 (4th Cir. 1973).
 
 
 73
 The fact that the company's appointments since 1965 exceed the ratio of qualified blacks and women in the workforce does not exonerate the company for the violations of the Act which the district court found. The tardy appointments of blacks and women to supervisory positions long after the passage of Title VII and the present lack of published job descriptions and objective selection procedures fully justify the injunctive relief the district court ordered. We believe, however, that the rate at which the company currently appoints blacks and women to supervisory positions is sufficient to show that there is no compelling need for the imposition of a quota.[18] But see Karst & Horowitz, Affirmative Action and Equal Protection, 60 Va.L.Rev. 955 (1974).
 
 IV
 
 74
 The company contends that the charge filed with the EEOC on January 3, 1969, was not timely because there were no discriminatory practices at either branch after January 15, 1968. It argues that for this reason the action should be dismissed for failure to meet the jurisdictional requirement of a timely charge.[19] The district court, however, found that the discrimination was of a continuing nature and properly held that the charge was timely. Williams v. Norfolk & Western Ry., 530 F.2d 539 (4th Cir. 1975); Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 994 (1973); see Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 467 n. 13, 95 S.Ct. 1716, 1723, 44 L.Ed.2d 295, 305 (1975) (dictum).
 
 
 75
 The district court ruled that the filing of the charge in 1969 did not toll the statute of limitations for the § 1981 action which was filed in 1973. The Supreme Court recently confirmed the district court's correct understanding of the law. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).
 
 
 76
 The district court applied the Virginia five-year statute of limitations to the § 1981 action. We have ruled, however, that the state's two-year statute applies to § 1982 actions. Allen v. Gifford, 462 F.2d 615 (4th Cir. 1972). Both § 1981 and § 1982 were enacted to redress infringements of closely related civil rights. We conclude, therefore, that the same two-year statute should apply to § 1981 actions. Accord, Revere v. Tidewater Telephone Co., 485 F.2d 684 (4th Cir., 1973) (unpublished opinion applying the two-year statute to a § 1981 action); cf. Almond v. Kent, 459 F.2d 200 (4th Cir. 1972). Accordingly, on remand, the two-year statute of limitations should be applied to the § 1981 claim. Of course, the point has little practical significance in this case in view of the fact that the § 1981 action was not tolled by the filing of the charge with the EEOC.
 
 
 77
 The district court ruled that back pay for sex discrimination should accruefrom April 8, 1967, two years before the charge was filed with the EEOC. The two-year period mentioned by the district judge conforms with the statute.[20] However, this charge did not allege discrimination against women. Instead, this type of discrimination was initially disclosed by the EEOC's investigation.[21] Dealing with similar circumstances, we held in EEOC v. General Electric Co., 532 F.2d 359, 371-372 (4th Cir. 1975), that in the absence of countervailing equities a trial court should limit back pay to two years before the employer received notice of the results of the investigation. On remand the district court should reconsider its decree in light of this case.
 
 
 78
 The judgment is affirmed in part and modified in part, and the case is remanded for further proceedings consistent with this opinion.
 
 
 79
 WIDENER, Circuit Judge (concurring and dissenting):
 
 
 80
 I concur in large part with the opinion of the court for the reasons stated in the opinion. I differ, however, in some respects, and as to those I respectfully dissent.
 
 
 81
 So far as the opinion is based on EEOC v. General Electric Company, 532 F.2d 359, No. 74-1974 (4th Cir. 1975), I dissent for the reasons set forth in my dissent in that case, our judgment in which is not yet final. I should say, however, that this case may be a somewhat closer one than General Electric because here, at least, sex discrimination was the subject of the EEOC complaint, while in General Electric it was not. This case points up the importance of requiring the EEOC to comply with its own regulations as well as the statute. The union here is excused from liability for discrimination on account of sex because the statute was not complied with. The reason especially emphasized and held is that ". . . a suit brought by the commission before attempting conciliation is premature," p. ----, because ". . . the commission's statutory duty to attempt conciliation is among its most essential functions." p. ----. Despite the fact that both the company and the union were deprived of the first conciliation step as set forth in 29 CFR § 1601.19a, as well as the statutory benefits of conciliation attempts, the company is held to liability, while the union is not, although the liability was caused by the collective bargaining agreement signed by both the company and the union. Thus, I dissent not only from the finding against the company, but also from the disparate treatment awarded the company and the union on facts which are indistinguishable.
 
 
 82
 While the subject of collective bargaining agreements is at hand, I should say I have grave reservations about considering evidence in this type case of the respective positions taken by the company and the union in negotiations leading up to collective bargaining agreements when the agreement results in unlawful discrimination. This is tantamount to allowing a good faith defense disapproved by us in Moody v. Albemarle Paper Company, 474 F.2d 134 (4th Cir. 1973). (Modified on other grounds, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)).
 
 
 83
 The district court had only this to say about damages:
 
 
 84
 "The formulation of the method of calculation and distribution of the back pay award and adjustment to the pension and profit-sharing plans will be complex sufficiently so as to tax the ingenuity and good faith of counsel. In this regard counsel are directed to confer with a view to agreeing on a plan of calculation and distribution of the back pay award for submission to the Court and, indeed, to explore the possibility of settling the monetary aspects of the case." App. p. 42.
 
 
 85
 With the opinion of the district court in mind, it is seen that the method of computing damages was not considered by that court and is not properly before this court, McGowan v. Gillenwater, 429 F.2d 586 (4th Cir. 1970), so the detailed discussion of that subject is a dictum. If the district court, in ascertaining damages, adopts standards with which either side is in disagreement, either is at perfect liberty to appeal the award. Taking up the matter now, and especially its treatment in detail, when the matter is so "complex" as to "tax the ingenuity and good faith of counsel," and upon no record, is too great a departure from what I conceive to be the proper rule of courts expressing opinions only with reference to existing controversies. There is no controversy at this time between the parties about this matter, and an expression of opinion I think beyond the legitimate function of an appellate court. I express no opinion as to the correctness of the dictum.
 
 
 86
 We hold that the imposition of quotas for supervisory positions is error because the "rate at which the company currently appoints blacks and women to supervisory positions is sufficient to show that there is no compelling need for the imposition of a quota," and, then, in note 18, explain that the maintenance of a quota is not a defense to a charge of racial or sexual discrimination. In view of our holding and note 18 just referred to, I think we go out of our way just earlier in the opinion to justify the imposition of quotas in hypothetical cases.
 
 
 87
 Since quotas themselves are the rankest kind of discrimination and their application, if valid in any context, requires exaggerated facts not present here, that general subject would be better left for another day.
 
 
 88
 Senator Clark, one of the sponsors of the statute and one of the Senate floor managers, filed, in Legislative History, 3014, in response to objections made by opponents of the legislation, a series of answers to the objections, among them the following (p. 3015):
 
 
 89
 "Objection: The bill would require employers to establish quotas for nonwhites in proportion to the percentage of nonwhites in the labor market area.
 
 
 90
 "Answer: Quotas are themselves discriminatory."
 
 
 91
 In view of the fact that the very existence of a quota is constitutionally suspect, the just quoted legislative interpretation of the statute, and our holding, such justification in hypothetical cases I think is out of place.
 
 
 
 [1]
 42 U.S.C. § 2000e-2 prohibits both employers and labor organizations from engaging in employment practices that discriminate on the basis of race or sex
 42 U.S.C. § 1981 assures all persons the same right to make and enforce contracts as is enjoyed by white citizens.
 
 
 [2]
 Federal Rule of Civil Procedure 52(a) provides in part that "(f)indings of fact (by the court) shall not be set aside unless clearly erroneous . . ."
 
 
 [3]
 The three positions for which lines of progression can be maintained are adjuster, overhaul adjuster, and adjuster prefabrication
 
 
 [4]
 E.g., EEOC v. Detroit Edison Co., 515 F.2d 301 (6th Cir. 1975); United States v. N. L. Industries, Inc., 479 F.2d 354 (8th Cir. 1973); United States v. Chesapeake & Ohio Ry., 471 F.2d 582 (4th Cir. 1972); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971)
 
 
 [5]
 The section-by-section analysis of the House bill states that "it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII." Legislative History of Equal Employment Opportunity Act of 1972, Government Printing Office (1972) at 1844. Papermakers, of course, was a prominent part of that case law
 
 
 [6]
 This principle is established by the legislative history. Senators Clark and Case, two of the bill's sponsors, circulated an interpretative memorandum stating that Title VII's operation was "prospective and not retrospective . . . (T)he employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis." 110 Cong.Rec. 6992 (daily ed. April 8, 1964), quoted in Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 516 (E.D.Va.1968)
 
 
 [7]
 The Clark-Case memorandum, note 6 supra, states that an employer "would not be obliged or, indeed, permitted to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of white workers hired earlier." 110 Cong.Rec. 6992 (daily ed. April 8, 1964)
 
 
 [8]
 As part of its compliance with the district court's decree, American conducted a canvass of its employees to determine the effect of bumping. The results of that survey are contained in a report filed with this court to supplement the record. The report showed that 40 employees requested jobs to which their plant-wide seniority would entitle them. One of these has already obtained the job he requested. The others would bump eight white male employees and 31 minority employees out of the jobs they now occupy. We stayed the provision of the decree that required bumping pending this appeal
 
 
 [9]
 See generally Introduction, The Second Decade of Title VII: Refinement of the Remedies, 16 Wm. & Mary L. Rev. 433, 436-37 (1975)
 
 
 [10]
 This measure of compensation is analogous to that awarded in an ordinary tort case, where compensation is assessed for one's loss of earnings whether the loss occurs before or after the judgment is entered. The analogy is apt because a statutory action attacking racial discrimination is fundamentally for the redress of a tort. See Curtis v. Loether, 415 U.S. 189, 195, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260, 266 (1974)
 
 
 [11]
 See Part IV infra for a discussion of the statute of limitations with respect to this issue
 
 
 [12]
 42 U.S.C. § 2000e-5(b)
 
 
 [13]
 42 U.S.C. § 2000e-5(f)(1)
 
 
 [14]
 We have held that the commission's failure to attempt conciliation is not a jurisdictional bar to an employee's action, because the employee cannot be charged with the commission's failure to execute its statutory duties. Russell v. American Tobacco Co., 528 F.2d 357, 365 (4th Cir. 1975); Johnson v. Seaboard Air Line R.R., 405 F.2d 645 (4th Cir. 1968). These cases, however, are inapposite where the commission's power to sue is in question
 
 
 [15]
 EEOC v. Raymond Metal Products Co., 530 F.2d 590, 596 (4th Cir. 1976)
 
 
 [16]
 The legislative history of Title VII indicates that it is not intended to be retroactive. See note 6 supra
 
 
 [17]
 The district court declined to reopen the record to consider this proffer. Under the ratio that the court used for comparative purposes, the evidence had but slight probative effect. Its import, however, is magnified by acceptance of the company's premise that its performance since 1965 is what must be examined in determining whether it has violated the Act. On remand the court should reexamine the situation at the Richmond office
 
 
 [18]
 We do not mean to suggest that the company may use its percentage of black and female supervisors as a defense to future charges of discrimination against blacks and women. It must consider each application on its merits. If the company discriminates against a black or a woman, it can be called to account for violating Title VII, regardless of the percentage of blacks and women among its supervisors
 
 
 [19]
 Before the 1972 amendments to Title VII, a charge had to be filed with the EEOC within 90 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(d) (1964). In 1972, this period was changed to 180 days. 42 U.S.C. § 2000e-5(e)
 
 
 [20]
 42 U.S.C. § 2000e-5(g)
 
 
 [21]
 See Part II supra