No. 68,980

DEBORAH A. WAGHER, *Appellee,* v. GUY'S FOODS, INC.,
*Appellant.*
(885 P.2d 1197)

Opinion
filed December 9, 1994.

*Susan P. Selvidge,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause and was on the briefs for appellant.

*Marc A. Powell,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Donald N. Peterson II,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a sex discrimination claim under the Kansas Act Against Discrimination (KAAD), K.S.A. 44-1001 *et seq.,* by Deborah Wagher against Guy's Foods, Inc., (Guy's Foods) based on failure to hire. The district court denied Guy's Foods' motion for summary judgment on two issues—that suit was barred by the statute of limitations and that Wagher was in-

eligible for the job due to Guy's Foods' nepotism policy. The case was tried to a jury, which awarded back pay, front pay, and damages for pain and suffering to Wagher. Guy's Foods appeals.

In September and December 1988, Deborah Wagher submitted applications to Guy's Foods for the position of route sales driver. A route sales driver is responsible for distribution of Guy's Foods' snack products on a preestablished route and for sales development within that territory.

There were openings for route sales drivers in September and December 1988, but Wagher was not hired. Male drivers were hired who had applied during the same period. It was the position of Guy's Foods that the men were hired because they had experience in route sales. It was the position of Wagher that she was not hired because she is a woman.

In December 1988, Dale Tilford, the district sales manager for Guy's Foods, told Wagher that she was not hired because the district general manager, John Kenna, said he did not hire women. On February 1, 1989, Wagher filed a complaint with the Kansas Commission on Civil Rights (KCCR), now the Kansas Human Rights Commission (KHRC). On January 8, 1991, she filed a complaint in federal district court, seeking relief under Title VII and the KAAD. On April 9, 1991, the KHRC dismissed the investigation of Wagher's complaint pursuant to its policy to do so when a civil action based on the same allegations has been filed. On July 31, 1991, the federal district court entered summary judgment against Wagher on her Title VII claim on the ground that it was untimely and dismissed the state claim without prejudice for lack of pendent jurisdiction. On December 20, 1991, Wagher filed suit in state court.

The case was tried to a jury in July 1992. The district court entered judgment on the jury's verdict in the amount of $76,200. Back pay was awarded in the amount of $47,700; front pay was awarded in the amount of $27,000; and damages for pain, suffering, and humiliation were awarded in the amount of $1,500. Additional facts will be related as are necessary to the determination of the issues raised by the appellant.

Guy's Foods contends that Wagher's claim was barred by the statute of limitations. Wagher's claim is under the KAAD, which

does not contain a statute of limitations for a civil suit. Guy's Foods filed a motion for summary judgment in the district court on the ground that Wagher's suit was barred by the two-year statute of limitations in K.S.A. 1993 Supp. 60-513. The district court denied the motion.

"Where the affirmative defense of the statute of limitations is asserted, summary judgment may be proper where there is no dispute or genuine issue as to the time when the statute commenced to run." *Gilger v. Lee Constr., Inc.*, 249 Kan. 307, 311, 820 P.2d 390 (1991). In the present case, there is a legal issue about when the statute began to run, but there does not seem to be evidence in dispute on this point.

The district court noted that K.S.A. 60-512(2) provides a three-year limitations period for "[a]n action upon a liability created by a statute other than a penalty or forfeiture." Based on this court's decision in *Flanigan v. City of Leavenworth*, 232 Kan. 522, 657 P.2d 555 (1983), however, the district court applied the two-year limitations period of K.S.A. 1993 Supp. 60-513. Subsection (a)(4) provides that "[a]n action for injury to the rights of another, not arising on contract," shall be brought within two years. In *Flanigan*, which was an employment discrimination suit under the KAAD, the court stated: "[S]ince this action is not one for libel, slander, assault, battery, malicious prosecution, false imprisonment or an action upon a statutory penalty or forfeiture, the two-year statute of limitations of K.S.A. 60-513 is properly applied here. [Citations omitted.]" 232 Kan. at 530.

Based upon K.S.A. 60-510 and *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 716 P.2d 575 (1986), the district court concluded that the two-year limitations period began to run on April 10, 1991, immediately following the KHRC's dismissal of its investigation. Wagher's suit was filed in December 1991, within two years of the dismissal date. The district court additionally considered the pendency of the administrative proceedings before the KHRC to have tolled the operation of the statute of limitations.

For Guy's Foods, the issue on appeal is not how long the limitations period is but when it began to run. It contends that the

district court correctly concluded that *Flanigan* controls on the question of which statute of limitations applies and adds that the two-year statute of limitations is in accord with federal law. For Wagher, the length of the limitations period is the threshold issue. She argues that the applicable statute is K.S.A. 60-512(2) because this is an action upon a liability created by statute. She relies on *Van Scoyk v. St. Mary's Assumption Parochial School*, 224 Kan. 304, 306, 580 P.2d 1315 (1978), for the proposition that rights created in the KAAD may be enforced in court. She relies on *Pecenka v. Alquest*, 6 Kan. App. 2d 26, 29, 626 P.2d 802, *rev. denied* 229 Kan. 670 (1981), as holding that rights created by the veterans' preference law, K.S.A. 73-201 *et seq.*, may be enforced in court and that the applicable statute of limitations for such an implied cause of action is K.S.A. 60-512(2).

Wagher also cites *Haag v. Dry Basement, Inc.*, 11 Kan. App. 2d 649, 650, 732 P.2d 392, *rev. denied* 241 Kan. 838 (1987). She states that it is the most recent appellate court decision interpreting K.S.A. 60-512(2). Mable Haag recovered damages under the Kansas Consumer Protection Act (KCPA) from Dry Basement, Inc. The company argued that the action was barred either by the two-year statute of limitations for fraud actions, 60-513(3), or by the one-year statute of limitations for an action upon statutory penalty or forfeiture, K.S.A. 60-514(3). The court disagreed on the grounds that a common-law action for fraud is not the same as a violation of the KCPA and that the nature of Haag's action was to recover upon a liability created by statute rather than upon a statutory penalty. 11 Kan. App. 2d at 651. In deciding that the three-year statute of limitations, K.S.A. 60-512(2), applied, the Court of Appeals stated:

"The appropriate inquiry to determine whether a liability is created by a statute (thus making K.S.A. 60-512[2] applicable) is whether liability for resultant damages would not arise but for the statute. *Pecenka v. Alquest*, 6 Kan. App. 2d 26, 28, 626 P.2d 802, *cert. denied* 229 Kan. 670 (1981). We conclude that the liability imposed by the KCPA fits in this category.

"The KCPA gives consumers a private right of action against suppliers who commit deceptive and unconscionable practices. K.S.A. 50-623(b); K.S.A. 50-634(b). Although the actions upon which a consumer may establish liability under the KCPA sound largely in fraud, see K.S.A. 50-626, a critical element of a

common-law fraud action, the intent to defraud, need not be proven. *Willman v. Ewen*, 230 Kan. 262, 267, 634 P.2d 1061 (1981) ('there may be liability even though the deception or unconscionable practice was performed innocently and without the intent to injure the consumer'); *Bell v. Kent-Brown Chevrolet Co.*, 1 Kan. App. 2d 131, 133, 561 P.2d 907 (1977). Further, it has been written:

'In determining the elements of proof required in a damage suit under [KCPA,] proof of the "deceptive trade practice" proscribed by the Act does not require proof of all the elements of a common law fraud.' Note, *A New Kansas Approach to an Old Fraud*, 14 Washburn L.J. 623, 635 (1975).

"We hold that because a supplier's liability to a consumer is created by the provisions of the Kansas Consumer Protection Act, the three-year statute of limitations for an action upon a liability created by statute, K.S.A. 60-512(2), applies to suits brought under the Act. That statute's three-year limitation has been clearly met in this case." 11 Kan. App. 2d at 650.

The Court of Appeals looked to a North Carolina case for this statement of a general rule of construction applied to statutes of limitations: " '[W]here there is doubt as to which statute of limitations should apply, the longer statute should be chosen.' " 11 Kan. App. 2d at 652 (quoting *Holley v. Coggin Pontiac*, 43 N.C. App. 229, 240-41, 259 S.E.2d 1, *cert. denied* 298 N.C. 806 [1979]). The Court of Appeals also found support for this rule of construction in the following cases from other jurisdictions: *San Manuel Copper Corporation v. Redmond*, 8 Ariz. App. 214, 218, 445 P.2d 162 (1968); *Jefferson v. Nero*, 225 Ark. 302, 306, 280 S.W.2d 884 (1955); *Sprung v. Rasmussen*, 180 N.W.2d 430, 433 (Iowa 1970); *Sprecher v. Magstadt*, 213 N.W.2d 881, 883 (N.D. 1973); *Shew v. Coon Bay Loafers, Inc.*, 76 Wash. 2d 40, 51, 455 P.2d 359 (1969). 11 Kan. App. 2d at 652.

The Court of Appeals concluded its discussion of the statute of limitations with the following:

"Finally, our conclusion that the three-year statute applies is in accordance with the general rule of statutory construction that statutes should be interpreted so as to give them their ordinary meaning. See, *e.g.*, *Phillips v. Vieux*, 210 Kan. 612, 617, 504 P.2d 196 (1972). It is clear that, under the terms of K.S.A. 60-512(2), an action under the KCPA is an action upon a liability created by statute. There is no corresponding action in the common law. Therefore, based upon the plain meaning of K.S.A. 60-512(2), we conclude that it is the appropriate statute governing actions under the KCPA." 11 Kan. App. 2d at 652.

Chief Justice Holmes presided on the panel which decided *Pecenka*, 6 Kan. App. 2d 26. Pecenka and Stewart were veterans of

military service who were discharged from the Department of Social and Rehabilitation Services due to budgetary considerations. Their state court claim was based on the veterans' preference law. The Court of Appeals found a duty to retain veterans in K.S.A. 73-203, which stated:

" 'In making any reduction of force in any of the departments, cities or towns of this state, the officers of such department, city or town shall retain those persons who may be equally qualified who have been honorably discharged from the military or naval service of the United States, and the widows and orphans of deceased soldiers and sailors.' " 6 Kan. App. 2d at 29.

The Court of Appeals stated its inquiry as follows:

"At the heart of this matter is whether the veteran's preference law, K.S.A. 73-201 *et seq.*, creates a liability other than a penalty or forfeiture. That is, we must determine whether K.S.A. 73-201 *et seq.* confers upon these veteran appellants the right to sue for damages or other relief thereunder. If the veteran's law does confer such a right, then the three-year statute of limitations applies and the appellants are correct in their claim that the trial court erred in dismissing their case.

"Where a statute is merely remedial in nature, in that it does not give any new rights, it does not create a statutory liability. See *Kirtland v. Tri-State Insurance Co.*, 220 Kan. 631, 556 P.2d 199 (1976); and *Farmers Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 227 Kan. 533, 538-9, 608 P.2d 923 (1980)." 6 Kan. App. 2d at 28.

The Court of Appeals concluded that the veterans' preference law created a liability which did not exist in the absence of the statute, that an action for damages would lie, and that the action for damages was implied by the statute. 6 Kan. App. 2d at 29. "The implied cause of action doctrine allows the enforcement of civil remedies without express legislative permission. See *Temmen v. Kent-Brown Chev. Co.*, 227 Kan. 45, 605 P.2d 95 (1980)." 6 Kan. App. 2d at 29.

Wagher contends that the KAAD is precisely analogous to the veterans' preference statute in this regard. The obligation to retain veterans did not exist at common law; it was created by the veterans' preference statute. The obligation to afford women equal opportunity in employment did not exist at common law. For each statutory right, Kansas courts have recognized a private enforcement action for damages. See *Van Scoyk*, 224 Kan. 304, Syl. ¶

2; *Pecenka*, 6 Kan. App. 2d 26, Syl. ¶ 5. Wagher contends that the Court of Appeals' conclusion in *Pecenka* fits as well in the present case: "Because the statute created the liability, we conclude that the applicable statute of limitations in the instant case is K.S.A. 60-512(2), the three-year statute, and that the trial court erred in holding that the two-year statute of limitations applied." 6 Kan. App. 2d at 29.

Guy's Foods argues that Wagher mistakenly relies on *Pecenka* for the critical proposition that where an action is implied by a statute, it can be said for statute of limitations purposes that the statute created the liability. It is Guy's Foods' position that in *Flanigan*, this court made it clear that the court rather than the KAAD created a private cause of action for employment discrimination. We fail to find the clarity in *Flanigan* to support Guy's Foods' position that this court created a cause of action for gender discrimination in employment. Flanigan alleged race discrimination in employment practices by a subunit of the City of Leavenworth, in violation of the KAAD. His complaint was investigated by the KCCR, a public hearing was held, the examiner ruled in favor of Flanigan in the amount of $5,196.41, and the KCCR adopted the examiner's report. 232 Kan. at 522-23. The Leavenworth city entity which had employed Flanigan filed a notice of appeal in the district court. After years of delay, the district court dismissed Flanigan's action as barred by the two-year statute of limitations, 60-513. 232 Kan. at 524.

This court devoted the principal portion of its opinion to the question whether the action should have been dismissed for failure to prosecute. 232 Kan. at 525-29. The first issue which the court had to resolve was "who should shoulder the burden of pushing the case to its conclusion." 232 Kan. at 527. The court stated: "[A] proceeding such as the one before the district court in this case has elements of both an original action and an appeal. As such the duty to prosecute should not be placed solely on the KCCR and the original complainant." 232 Kan. at 529. The court concluded that the delay "must be attributed to the trial court," and "[f]or this reason the dismissal with prejudice against Flanigan and the KCCR was improper." 232 Kan. at 529.

The court's entire discussion of the statute of limitations follows:

"A separate question exists as to whether the action against the City was barred by K.S.A. 60-513, the two-year statute of limitations. The district court felt it was because the statute began to run either when the resolution abolishing the LRC was passed in November of 1973 or during argument before the Supreme Court in *Flanigan I.*

"Initially, it should be noted that since this action is not one for libel, slander, assault, battery, malicious prosecution, false imprisonment or an action upon a statutory penalty or forfeiture, the two-year statute of limitations of K.S.A. 60-513 is properly applied here. See *Miller v. City of Overland Park*, 231 Kan. 557, 646 P.2d 1114 (1982); *Cooper v. Hutchinson Police Department*, 6 Kan. App. 2d 806, 636 P.2d 184 (1981), *rev. denied* 230 Kan. 817 (1982)." 232 Kan. at 530.

From the court's listing of causes of action in the paragraph immediately above, it is apparent that the court viewed the decision as a choice between the one-year statute of limitations, K.S.A. 60-514, and the two-year statute of limitations, K.S.A. 1993 Supp. 60-513. K.S.A. 60-514, before it was amended in 1993, provided:

"The following actions shall be brought within one (1) year. (1) An action for libel or slander.

(2) An action for assault, battery, malicious prosecution, or false imprisonment.

(3) An action upon statutory penalty or forfeiture."

Guy's Foods contends that in *Flanigan,* the court held that the two-year statute of limitations, 60-513, applies to actions based on the KAAD. It is more accurate to say, between the one- and two-year statutes of limitations, the court endorsed the two-year statute. In Wagher's words, *"Flanigan* cannot be relied upon to exclude the application of K.S.A. 60-512(2) to claims brought within three years for a violation of the KAAD."

In *Van Scoyk*, Protestant teachers were terminated from employment in a Catholic school. Each filed a complaint with the KCCR. A no probable cause determination was made for each, and the files were closed. The teachers filed suit in district court against the school for employment discrimination and against the KCCR, alleging that its action was arbitrary and seeking to have the matter reopened for trial on their claims of discrimination.

The court concluded that the district court's dismissal of the KCCR was correct because "no appeal lies from a No Probable Cause determination by the investigating commissioner." 224 Kan. at 305 (citing *Bush v. City of Wichita,* 223 Kan. 651, 576 P.2d 1071 [1978]). With respect to the teachers' claims against the school, the court concluded that "[a]fter a No Probable Cause determination is made and the Commission's file is closed, an aggrieved person may bring an independent civil action in the district court, based upon an alleged violation of K.S.A. 1977 Supp. 44-1009." 224 Kan. 304, Syl. ¶ 2. Guy's Foods emphasizes the adjective "independent" in the court's syllabus paragraph and urges that it means "independent of the statute."

In the recent case of *Wright v. Kansas Water Office,* 255 Kan. 990, 881 P.2d 567 (1994), we discussed the application of K.S.A. 60-512(2) to a civil service termination. We concluded that Wright's claim, based upon his termination as a classified employee in the Kansas Water Office, was based on the Kansas Civil Service Act, K.S.A. 75-2925 *et seq.* Therefore, his claim was an "action upon a liability created by statute" and thus barred by the three-year limitation of K.S.A. 60-512(2).

We find *Wright, Haag,* and *Pecenka,* controlling as to this issue. We conclude that the KAAD does impose the obligation not to discriminate against women in employment where no obligation previously existed under common law. Thus, the liability is created by statute, and K.S.A. 60-512(2) applies. We find no merit in Guy's Foods' argument that the liability was created by the court and not by statute. Neither *Flanigan* nor *Van Scoyk* created or imposed a liability for discrimination against women in employment independent of the KAAD. Rather, in *Van Scoyk,* we recognized an alternative action "based upon an alleged violation of K.S.A. 1977 Supp. 44-1009." 224 Kan. 304, Syl. ¶ 2. As stated by Wagher, "[E]ven if the *Van Scoyk* Court created the right to file an independent action in district court as another means of enforcing the KAAD, that right is merely procedural and does not affect the statute of limitations to be applied."

We next determine when the three-year statute of limitations began to run on Wagher's KAAD claim. Guy's Foods urges this

court to use the rule from *Chardon v. Fernandez*, 454 U.S. 6, 70 L. Ed. 2d 6, 102 S. Ct. 28 (1981), and *Delaware State College v. Ricks*, 449 U.S. 250, 66 L. Ed. 2d 431, 101 S. Ct. 498 (1980), that the limitations period applicable to employment discrimination actions under 42 U.S.C. § 1981 (1988) and 42 U.S.C. § 1983 (1988) begins to run when the plaintiff receives notice of the adverse employment action. Guy's Foods' position is that Wagher received notice on or about December 23, 1988, when Tilford told her that Kenna would not hire a woman, and that that is when the limitations period began.

Wagher contends that the rule for determining when a statute of limitations begins to run is set out in K.S.A. 60-510: "Civil actions, other than for the recovery of real property, can only be commenced within the period prescribed in the following sections of this article, *after the cause of action shall have accrued.*" (Emphasis added.) For the word on when a cause of action accrues, Wagher turns to *Pancake House*, 239 Kan. 83, Syl. ¶ 2:

> "In general, a cause of action accrues, so as to start the running of the statute of limitations, as soon as the right to maintain a legal action arises. The true test to determine when an action accrues is that point in time at which the plaintiff could first have filed and prosecuted his action to a successful conclusion."

According to Wagher, a person who files a claim under the KAAD with the KHRC must exhaust his or her administrative remedies before filing a civil action. She relies on *Van Scoyk*, 224 Kan. at 307, and *Parker v. Kansas Neurological Institute*, 13 Kan. App. 2d 685, Syl. ¶ 1, 778 P.2d 390, *rev. denied* 245 Kan. 785 (1989). In both cases, the court stated that a civil action may be filed once administrative remedies are exhausted. In neither case was the principal question whether exhaustion of administrative remedies was required. The exhaustion requirement was the court's focus in *Jarvis v. Kansas Commission on Civil Rights*, 215 Kan. 902, 528 P.2d 1232 (1974), and *Jenkins v. Newman Memorial County Hospital*, 212 Kan. 92, 510 P.2d 132 (1973). In each case, the court affirmed the district court's dismissal of the plaintiff's KAAD claim for failure to exhaust administrative remedies. In each case, the court cited K.S.A. 44-1010, which provides:

"Any party being dissatisfied with any order or decision of the commission may petition for reconsideration in accordance with the provisions of K.S.A. 77-529 and amendments thereto. No cause of action arising out of any order or decision of the commission shall accrue in any court to any party unless such party shall petition for reconsideration as herein provided. No party shall, in any court, urge or rely upon any ground not set forth in the petition for reconsideration."

In *Jenkins,*the complainant had neglected to file a motion for re-hearing as required by K.S.A. 44-1010. In *Jarvis,* the complainant filed suit in district court before a hearing had been held by the commission.

In the present case, Guy's Foods does not argue that Wagher failed to exhaust her administrative remedies. The employer instead equates termination of the proceedings by the KHRC—by dismissing its investigation and closing its file upon notification that the federal court suit was filed—with exhaustion of administrative proceedings.

According to Wagher, her cause of action under the KAAD accrued when the KHRC closed its file on April 9, 1991. She contends that even if the two-year statute of limitations applies, the limitations period did not begin to run until April 1991 and would not have expired until April 1993.

We agree with Guy's Foods that the statute of limitations began to run on December 23, 1988, when Wagher was told of the reason she was not hired. At that time, everything that needed to occur to file her claim with the KAAD had occurred. Wagher had a cause of action against Guy's Foods, but she was precluded from filing it until the administrative remedies were exhausted.

In addition to concluding that the two-year statute of limitations applied and that the cause of action accrued when the KHRC closed its investigative file, the district court concluded that the pendency of the administrative proceedings tolled the running of the statute of limitations. The district court cited as authority *Keith v. Schiefen-Stockham Insurance Agency, Inc.*, 209 Kan. 537, Syl. ¶ 5, 498 P.2d 265 (1972). In that syllabus paragraph, the court stated:

"The rule in this jurisdiction is that if a person is prevented from exercising his legal remedy by the pendency of legal proceedings, the running of the statute

of limitations applicable to the remedy is postponed, or if it has commenced to run, is suspended or tolled, during the time the restraint incident to the proceedings continues."

The legal proceedings referred to were previous litigation reported in *Otta v. Johnson*, 204 Kan. 366, 461 P.2d 758 (1969), a workers compensation action against the employer and his alleged insurance carrier by the widow and children of Lionel Otta, who was killed in a truck owned by Johnson. Due to Schiefen-Stockham's alleged failure to procure the workers compensation insurance, *Otta v. Johnson* was concluded adversely to the widow and children, who were also the plaintiffs in the second suit, *Keith v. Schiefen-Stockham*. Plaintiffs sought recovery from Schiefen-Stockham for the failure to procure insurance, and Schiefen-Stockham sought dismissal on several grounds, including that the second suit was barred by the statute of limitations. The court rejected this ground for dismissal because "[p]laintiffs were effectively prevented from suing defendants until it was finally determined in *Otta v. Johnson*, supra, that insurance had not been procured, nor an election caused to be filed, and with respect to the action sounding in tort actual damages did not result until a final determination of those matters." 209 Kan. at 544.

In *Lindenman v. Umscheid*, 255 Kan. 610, 875 P.2d 964 (1994), the issue of the statute of limitations' tolling arose as to plaintiffs' claim against the Kansas Department of Health and Environment (KDHE) for abuse of process. Plaintiffs' claim was based on KDHE's issuing an emergency order suspending the license of plaintiffs' day care center. KDHE appealed the district court's order enjoining the enforcement of the emergency order. Plaintiffs argued that, as in *Pizel v. Zuspann*, 247 Kan. 54, 795 P.2d 42 (1990), their claim was tolled until the appeal of the injunction was determined. KDHE argued the injunction did not affect the merits of plaintiffs' claim, and, unlike *Pizel*, plaintiffs were not prevented from pursuing their claim while the appeal was pending. We agreed with the plaintiffs, stating:

"Until the appeal of the district court's injunction was determined in favor of the Lindenmans, the statute of limitations was tolled. The Lindenmans were precluded from bringing the action against the defendant until a final deter-

mination was made. Until that final determination was made, the plaintiffs could have filed but could not have prosecuted their claim for abuse of process to a successful conclusion. We find that the cause of action for abuse of process was tolled until KDHE dismissed its appeal on November 7, 1989." 255 Kan. at 623-24.

Here, Wagher was precluded from bringing her action against Guy's Foods until she had exhausted her administrative remedies under the KAAD. Until her administrative remedies were exhausted, she could not process her claim to successful conclusion in the district court. We conclude that the district court correctly held the statute was tolled during the pendency of the administrative proceedings. Wagher filed her claim with the KHRC on February 1, 1989, 39 days after she was told on December 23, 1988, the reason for Guy's Foods' not hiring her. She filed this action on December 20, 1991, 255 days after the KHRC closed her file on April 9, 1991. Thus, 294 untolled days passed between December 23, 1988, and December 20, 1991, well within the three-year statute of limitations.

Guy's Foods next contends that relief was precluded under the KAAD due to Guy's Foods' rule against nepotism. At the time Deborah Wagher applied for the route sales driver jobs, her husband already was employed by Guy's Foods as a route sales driver. Guy's Foods had a rule against nepotism, which had been issued in 1974, and stated in pertinent part: "It is the general policy of the Company not to employ close relatives in the same department . . . . For purposes of this policy, 'close relative' is defined as . . . spouse."

On the ground that there existed genuine disputes of material facts, the district court denied Guy's Foods' motion seeking summary judgment in which it contended that relief was precluded under the KAAD due to its anti-nepotism policy that made Wagher ineligible for employment. In its order denying summary judgment, the district court stated:

"Plaintiff has filed an affidavit stating that she was qualified to work at Guy's Foods in Wichita as a route delivery sales person. Plaintiff has also submitted the affidavit of Dale Tilford, stating that plaintiff was qualified to work at Guy's Foods and that defendant's nepotism policy was not enforced in most instances. Specifically, Mr. Tilford's affidavit cites several examples of relatives working at

Guy's Foods as route drivers. Defendant has filed affidavits contrary to plaintiff's affidavits, setting forth defendant's position on its nepotism policy."

Wagher states, and it is apparent from the trial transcript, that Guy's Foods presented its anti-nepotism defense to the jury. The jury received an instruction on rules against nepotism. Guy's Foods did not object to the instruction, which stated:

"It is the law of this state that an employer's rule which forbids or restricts the employment of married women and which is not applicable to married men is a discrimination based on sex prohibited by the Kansas Act Against Discrimination. It is not relevant that the rule is not directed against all females, but only against married females, for so long as sex is a factor in the application of the rule, such application involves a discrimination based on sex.

"A woman should not be denied employment by an employer due to rules against nepotism if she is otherwise qualified to perform the required work."

The instruction was based on K.A.R. 21-32-4, which provides:

"(a) The commission has determined that an employer's rule which forbids or restricts the employment of married women and which is not applicable to married men is a discrimination based on sex prohibited by the Kansas act against discrimination. It does not seem to us relevant that the rule is not directed against all females, but only against married females, for so long as sex is a factor in the application of the rule, such application involves a discrimination based on sex. This rule also applies to unmarried women who happen to be mothers for example; in many instances women who have small children in the home are denied employment. Such discrimination usually takes place at the initial employer's screening process through the asking of such questions as 'How old are your children? How many children do you have? What are your plans for providing care for your children?'

"(b) An employed woman should not have her employment terminated when she marries a man who works for the same business or institution by whom she is employed. At the same time, a woman should not be denied employment by an employer due to rules against nepotism if she is otherwise qualified to perform the required work."

Although Guy's Foods did not object to the instruction, on appeal it captions the nepotism portion of its brief as follows: Wagher's "Ineligibility For Hire Under Guy's Nepotism Policy Precludes Any Relief Under KAAD." In other words, Guy's Foods presents this as a matter of law even though it seems that it did not preserve the issue as one of law: "Guy's had a legal right to refuse to hire relatives in the same department under a non-discriminatory policy, and should have had summary judgment."

As best we understand Guy's Foods' position, it is that the instruction was not objectionable because it is an accurate statement of the law, that is, the regulation. Guy's Foods does not challenge the validity of the regulation. Instead, it argues that the last sentence of subsection (b), the one which addresses rules against nepotism, must be read as modified by the first sentence of subsection (a). The first sentence declares that rules which apply to married women but not to married men violate the KAAD. Thus, the argument continues, the properly construed regulation and instruction prohibit a woman, who is otherwise qualified to perform the required work, from being denied employment due to rules against nepotism *if and only if* the rules are not equally applicable to men and women.

Wagher's primary response seems to be that the plain language of the regulation prohibits denial of employment to a woman due to rules against nepotism. She focuses exclusively on the last sentence of subsection (b). Wagher adds that the legislature's policy in enacting the KAAD of eradicating and preventing discrimination based on sex is carried out in her reading of the regulation. She explains that a nepotism policy may have an adverse impact on women applying for male-dominated jobs, such as the route sales driver job.

Guy's Foods relies on federal cases and urges this court to apply what it represents to be the federal rule, that a plaintiff cannot recover under the discrimination laws unless "entitled to the job in the first place." In Guy's Foods' construct, being entitled to the job means not being a close relative of an employee. Wagher distinguishes the federal cases relied on by Guy's Foods on the ground that each involved misconduct of the employee or applicant. Wagher's factual distinction seems to be appropriate, but Guy's Foods insists that the cases do stand for the proposition that disqualification for any reason precludes recovery.

Policies regarding nepotism are the subject of 1 CCH Employment Practices ¶ 449 (1993). The practice guide distinguishes between nepotism policies which favor giving jobs to persons who are relatives or friends and anti-nepotism policies. Instances of each type of policy having the effect of limiting job opportunities

on impermissible bases, such as race and sex, are discussed. In *Matter of Sanbonmatsu v. Boyer*, 45 App. Div. 2d 249, 357 N.Y.S.2d 245 (1974), a school's anti-nepotism rule, which precluded the hiring of wives of faculty members, resulted in unlawful sex discrimination. The court required the employer to show that the rule was necessary for successful job performance, and the employer's showing in that case was inadequate. The evidence also established that application of the policy had been uneven. The practice guide also notes a case from federal district court in Kentucky in which the employer's attempt to use an anti-nepotism policy as the reason for denying employment to a female applicant was rejected. *Linebaugh v. Auto Leasing Co.*, 18 E.P.D. ¶ 8904 (D. Ky. 1978). The court judged the employer's defense to be a pretext because exceptions to the anti-nepotism policy had been made in the past for men.

Guy's Foods concedes that there were exceptions to its anti-nepotism policy. It explains the exceptions as resulting from relatives who bought distributorships when Guy's Foods sold them to the public and then became employees when Guy's Foods repurchased the distributorships. Guy's Foods lists four exceptions among "[e]mployees who were distributors."

Wagher contends that the jury found Guy's Foods' defense to be a pretext. She notes that the jury heard and rejected Guy's Foods' proof that its anti-nepotism policy was a legitimate, non-discriminatory reason for not hiring her. On the special verdict form, the jury answered the following question in the negative: "Do you find from a preponderance of the evidence that the defendant has established a legitimate, non-discriminatory reason(s) for not hiring plaintiff, and that the defendant would have made the same decision even if plaintiff's gender had not been taken into account?" Wagher urges that the jury's negative finding indicates that Guy's Foods, the party bearing the burden of proof on this issue, did not sustain its burden. This court has stated that on appeal, a jury's "negative finding will not be disturbed absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice." *EF Hutton & Co. v. Heim*, 236 Kan. 603, 610, 694 P.2d 445 (1985).

The following evidence is cited by Guy's Foods as tending to show that the exceptions did not swallow its anti-nepotism policy:

1. Gene Hill testified that when he was a distributor, his son-in-law, Frank Beauchamp, worked for approximately two weeks as an extra driver.

2. Kenny Stoneking testified that he and his brother were employed by Guy's Foods, and then both purchased distributorships. When the distributorships were repurchased by Guy's Foods, his brother quit.

3. Kay Pruitt testified that she and her husband were distributors. When the distributorships were repurchased by Guy's Foods, both were employed by Guy's Foods until her husband quit.

4. Don Croney testified that his uncle, Dennis Sullivan, was hired as the district sales manager in 1990. At that time Croney was a distributor, and Sullivan was his boss. When the distributorships were repurchased by Guy's Foods, both were employed by Guy's Foods.

5. The distributorships were created in 1984. In 1988, Guy's Foods decided to buy back the routes. An agreement was entered into with the union which would make distributors employees. This agreement had no proviso for "close relatives." Dennis Wagher had not been a distributor. He was employed as a route sales driver at the time the distributorships were created, but he could not afford to purchase a route. He became re-employed by Guy's Foods as a route sales driver after the company repurchased the distributorships.

The question is whether the jury arbitrarily disregarded this evidence in rejecting the anti-nepotism policy as a legitimate, non-discriminatory explanation for Guy's Foods' not hiring Deborah Wagher. See *EF Hutton*, 236 Kan. at 610. Evidence that Guy's Foods employed close relatives in the department Wagher sought to join was given by Kenny Stoneking, Kay Pruitt, and Don Croney. Guy's Foods argues that "[t]here was no evidence that anyone in management knew those with different names [, *e.g.*, Croney and his uncle, Sullivan,] were related." It seems, however, that Sullivan *was* someone in management. With respect to Mr.

and Mrs. Pruitt, Guy's Foods seems to argue that their employment should not count as an exception to its anti-nepotism policy because it was pursuant to its agreement with the union to convert distributors to employees. Guy's Foods, however, provides no authority which suggests that evidence of uneven application of an anti-nepotism policy is trumped by a union agreement. Nor does Guy's Foods suggest that the trier of fact in the present case was instructed that due to the union agreement, Guy's Foods did not need to be consistent in applying its rule. We note that the jury was instructed about other aspects of the collective bargaining agreement between Guy's Foods and the union. Guy's Foods disregards evidence that the Stoneking brothers were employees before they were distributors. It does not appear, therefore, that the jury's finding was the result of arbitrary selection of evidence.

Guy's Foods took the position that K.A.R. 21-32-4 provided that an otherwise qualified woman should not be denied employment by an employer due to rules against nepotism which are not applied equally to men and women. It therefore did not challenge the validity of the regulation or object to the jury instruction in the district court and does not challenge the validity of the regulation on appeal. For this reason and because the jury found that Guy's Foods' anti-nepotism policy was not a legitimate, nondiscriminatory reason for not hiring Wagher, we need not decide how the regulation should be construed. We note in passing that the regulation could be subject to differing interpretations, and clarification would be beneficial to those who are subject to the legislation.

We next consider if Wagher was entitled to a jury under the KAAD. At the time she filed her petition in district court, Wagher demanded a jury trial. Guy's Foods filed a motion seeking an order denying the jury demand. The district court denied Guy's Foods' motion and granted a jury trial to Wagher. The case was tried to a jury.

Guy's Foods contends that Wagher's claim is an equitable one and that under *In re Petition of City of Moran*, 238 Kan. 513, 518, 713 P.2d 451 (1986), an action grounded on equitable rights and in which equitable relief is sought is not appropriate for jury

determination. Guy's Foods further contends that a KAAD complainant who completes the administrative process does not have the right to a jury trial and that a complainant who short-circuits the process should not have a greater right than one who does not. Wagher argues that K.S.A. 44-1011(b) provides for a jury trial for KAAD complainants who demand a jury in accordance with K.S.A. 60-238.

K.S.A. 44-1011(b)(3) provides in pertinent part as follows:

"Any action of the commission pursuant to the Kansas act against discrimination is subject to review in accordance with the act for judicial review and civil enforcement of agency actions except: . . . (3) on review, the court shall hear the action by trial *de novo* with or without a jury in accordance with the provisions of K.S.A. 60-238 and amendments thereto, and the court, in its discretion, may permit any party or the commission to submit additional evidence on any issue."

K.S.A. 60-238 provides in pertinent part:

"(a) . . . The right of trial by jury as declared by section 5 of the bill of rights in the Kansas constitution, and as given by a statute of the state shall be preserved to the parties inviolate.

"(b) . . . Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than ten (10) days after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party."

In pertinent part, K.S.A. 60-239(a) provides:

"When trial by jury has been demanded as provided in K.S.A. 60-238, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless . . . the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the constitution or statutes."

In *City of Moran,* the petition filed by the City sought a declaratory judgment that the proceeds from the sale of certain property should have gone to the City to satisfy bondholders. On appeal, the bank argued that it was deprived of the right to trial by jury as provided under K.S.A. 60-238 and 60-239. 238 Kan. at 517.

This court stated the following general principles which govern entitlement to a jury in this state:

"The right to a jury trial in a civil proceeding in Kansas is not absolute. Constitutional and statutory provisions establish general principles to be followed by the courts in determining whether one is entitled to a jury trial. The right to a jury trial refers to that right as it existed under the common law. At common law and under the Kansas constitution, a party is not entitled to a trial by jury as a matter of right in a suit in equity. *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 664 P.2d 813 (1983)." 238 Kan. at 517-18.

K.S.A. 60-257 provides that in a procedure for obtaining a declaratory judgment, "the right to trial by jury may be demanded under the circumstances and in the manner provided in K.S.A. 60-238 and 60-239." From this, the court drew the following conclusion:

"Therefore, the right to a jury trial in an action for a declaratory judgment is not absolute. It must first be determined whether the declaratory judgment action is equitable in nature or one at common law. In determining whether the action for a declaratory judgment is one in equity, the test is whether the essential nature of the action is grounded on equitable rights and is one in which equitable relief is sought. *Karnes Enterprises, Inc. v. Quan*, 221 Kan. 596, 561 P.2d 825 (1977)." 238 Kan. at 518.

In *City of Moran*, the bank made no claim that K.S.A. 60-257 was a "statute of the state," giving it a right to a jury trial. For that reason, the court's discussion on the right to a jury trial related only to whether the bank had a right to a jury trial under § 5 of the Kansas Constitution Bill of Rights and not on whether K.S.A. 60-257 gave the bank that right. The court determined the bank had no such right because its action for a declaratory judgment was "grounded on equitable rights" and "did not entitle the parties to a jury trial at common law." 238 Kan. at 518. An additional basis for the decision was that the facts were not disputed; thus, there were no questions of fact for a trier of fact to resolve. The only questions were statutory interpretations. The same is not true of actions based on the KAAD. The scope of this Act is limited to unlawful discriminatory practices, few of which do not involve issues of fact.

Guy's Foods also relies on *Best v. State Farm Mut. Auto. Ins. Co.*, 953 F.2d 1477 (10th Cir. 1991). In *Best*, the federal Court of Appeals looked to this court's decision in *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 648 P.2d 234 (1982), and noted that

this court "analyzed the KAAD by analogizing to Title VII. *See Woods*, 648 P.2d at 239, 240-41, 243-44." 953 F.2d at 1481. That a basis for this court's decision was the absence of an absolute right to a jury under either statutory scheme seemed to be of particular significance to the federal panel. See 953 F.2d at 1481-82. Concluding its construction of the KAAD, the federal court stated: "Because we view Kan. Stat. Ann. § 44-1009 as providing primarily equitable relief, the fact that it may have a 'legal characteristic' to the extent that it allows up to $2,000 for pain, suffering, and humiliation does not render the cause of action legal." 953 F.2d at 1482. The federal court then turned to federal law to answer the question whether Best was entitled to a jury. See 953 F.2d at 1481 (citing *Simler v. Conner*, 372 U.S. 221, 222, 9 L. Ed. 2d 691, 83 S. Ct. 609 [1963]). It concluded:

"Because the Kansas Supreme Court has held that the KAAD is to a large extent analogous to Title VII, and because it is well-settled law that an employee is not entitled to a jury trial under Title VII, we affirm the district court's conclusion that Best was not entitled to have a jury consider her retaliation claims under the KAAD." 953 F.2d at 1482.

Guy's Foods' reliance on *Best* is misplaced. In *Best*, unlike here, no claim was made that the right to jury trial is given by statute. In addition, since *Best* was decided, Congress has amended Title VII to allow recovery of compensatory and punitive damages. Now, "[i]f a complaining party seeks compensatory or punitive damages under this section—any party may demand a trial by jury." 42 U.S.C. § 1981a(c) (Supp. V 1993). With the addition of this monetary award of damages and the express right to a jury trial when a complainant seeks damages, the conclusion is no longer foregone that damages will be only incidental to the equitable relief provided under Title VII—reinstatement, hiring, promotion, seniority adjustment, and back pay, for example.

We would note in passing that in *Dairy Queen v. Wood*, 369 U.S. 469, 8 L. Ed. 2d 44, 82 S. Ct. 894 (1962), the United States Supreme Court held the right to a jury trial in the federal courts is not lost where the legal issues are incidental to the equitable issues. Having made that decision, the Court concluded that

"the district judge erred in refusing to grant petitioner's demand for a trial by jury on the factual issues related to the question of whether there has been a

breach of contract. Since these issues are common with those upon which respondents' claim to equitable relief is based, the legal claims involved in the action must be determined prior to any final court determination of respondents' equitable claims." 369 U.S. at 479-80.

There is no question that the present case contains legal issues. At the time this court decided *Woods*, K.S.A. 44-1005 contained no authority to order the payment of damages for pain, suffering, and humiliation, and the court stated that it could find no statutory authority for payment of punitive damages. 231 Kan. at 770. The legislature since has added express authority for the commission to award damages for pain, suffering, and humiliation. An action to recover such damages is in the nature of a suit at common law and is a legal action. 231 Kan. at 773. In the present case, the jury awarded back pay, front pay, and damages for pain and suffering to Wagher. K.S.A. 44-1005(k) provides that the KHRC may render an order which "include[s] an award of damages for pain, suffering and humiliation which are incidental to the act of discrimination" not to exceed $2,000.

Wagher urges that the inquiry should be whether K.S.A. 44-1011(b) is a statute of the state within the meaning of K.S.A. 60-238 which gives the right of trial by jury, and she further urges that the inquiry be answered in the affirmative. She states that the question was asked but not answered in *Stephens v. Unified School District*, 218 Kan. 220, 546 P.2d 197 (1975). There, the court stated:

"We note first of all that the *de novo* language and the reference to 60-238 were inserted in the statute for the first time in 1965 (L. 1965, ch. 323, § 7). Prior to the amendment the sentence merely said 'The court shall hear the appeal with or without a jury and the court may, in its discretion, permit any party or the commission to submit additional evidence on any issue.' The additions, presumably, were intended to make some significant change. (*Curless v. Board of County Commissioners*, 197 Kan. 580, 587, 419 P.2d 876; *Horyna v. Board of County Commissioners*, 194 Kan. 445, 448, 399 P.2d 844.) The addition of the phrase *de novo* surely signifies an intent that the court should hear the case 'anew.' And looking to the section of the code of civil procedure newly referred to, we find it deals with jury trials as of right. It makes such a trial available on demand in cases where it is guaranteed by the Constitution or where 'given by a statute of the state.'

"Whether 44-1011 was itself intended to be a 'statute of the state' which gives a jury trial as of right is a question of some difficulty. That question need not

be determined in this case, however, because no demand for a jury trial was made. It is enough for present purposes to recognize that a jury trial is available at least in those cases covered by section 5 of the Bill of Rights." 218 Kan. at 230-31.

The court then concluded that, where a jury trial is proper, the proceeding is not a limited type of administrative review on the record, stating:

"The statutory provisions authorizing the court to receive additional evidence and to 'modify' the commission's order are both consistent with a true trial *de novo*. The statutory statement that 'The review shall be heard on the record *without requirement of printing*' we take to be a mechanical direction with a view to economy, and not a nullification of the previously granted authority to take additional evidence.

"In short, the court concludes that when the legislature called for a trial *de novo* ('with or without a jury in accordance with the provisions of K.S.A. 60-238') it meant a trial where the issues of both fact and law would be determined anew." 218 Kan. at 232.

The language relative to a jury trial in K.S.A. 44-1011(b)(3) differs substantially from that in K.S.A. 60-257. The latter statute provides "the right to trial by jury may be demanded under the circumstances and in the manner provided in K.S.A. 60-238 and 60-239." The use of "may demand" and "under the circumstances" denotes the right must exist either in a statute other than 60-257 or in the Kansas Constitution. As we said in *City of Moran*, "Therefore, the right to a jury trial in an action for a declaratory judgment is not absolute." 238 Kan. at 518. The former statute, however, mandates a "trial *de novo* with or without a jury in accordance with the provisions of K.S.A. 60-238." We interpret K.S.A. 44-1011(b)(3) to provide the right to a trial with a jury where demand is made as required by K.S.A. 60-238. The district court did not err in granting Wagher a jury trial on her claims.

We next determine if Wagher established a prima facie case of employment discrimination. Guy's Foods contends that the district court erred in denying its motions for directed verdict and judgment notwithstanding the verdict "on the issue that plaintiff failed to meet her burden to prove she was the most qualified person for the job." Elsewhere, Guy's Foods contends that the district court's error lay "in denying defendant's motion for di-

rected verdict and motion for JNOV regarding plaintiff's failure to prove the essential prima facie element of qualification." Through a combination of imprecise language and overstatement, Guy's Foods muddies this issue. At the outset, it should be noted that there is no requirement in employment discrimination litigation that the complainant prove that he or she is more qualified than others who received more favorable treatment. In addition, it should be settled that Guy's Foods seems to be challenging the district court's conclusion that Wagher met her initial burden of establishing a prima facie case of discrimination rather than the jury's determination that discrimination had been proved by a preponderance of the evidence.

Guy's Foods looks to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), for the following statement of a Title VII complainant's initial burden of establishing a prima facie case of discrimination:

"This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

Guy's Foods argues that Wagher was not qualified because she had never held a job in route sales or where she made sales presentations to customers. Wagher counters that she did prove that she was qualified for the job. The evidence showed that she had accompanied her husband and helped him on his sales route for many months. He testified that she was qualified to perform the job. The district sales manager testified that he had observed her helping and that she was well qualified for the job. Another driver who had been helped by Deborah Wagher on five or six occasions testified that her work was good and that "[s]he knew the product and how to display it and where to display it." Another driver testified that helping another route sales driver would be a good qualification for a driver's position.

Wagher also contends that the statement of the initial burden of proof from *McDonnell Douglas* is inapplicable in the present case. In *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111,

121, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985), the United States Supreme Court stated that

"the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. See *Teamsters v. United States,* 431 U.S. 324, 358 n.44 (1977). The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.' *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (CA1 1979)."

At this point, it would be appropriate to comment on the relation of the evidentiary structures of federal Title VII cases to those of cases based upon the KAAD. In *Woods,* this court stated:

"Federal court decisions concerning Title VII are not controlling on this court. *Harder v. Kansas Comm'n on Civil Rights,* 225 Kan. 556, 559, 592 P.2d 456 (1979). They are persuasive authority, however. *McCabe v. Board of Johnson County Comm'rs,* 5 Kan. App. 2d 232, 235, 615 P.2d 780 (1980). Especially is this true when they concern general law in the field of civil rights. We accept and embrace the rules stated in *Burdine* as to burden of proof, prima facie case and burden of going forward with the evidence in discrimination cases." 231 Kan. at 767.

In *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-56, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981), the Supreme Court built on the base of shifting burdens set forth in *McDonnell Douglas.* In *Burdine,* the focus was on the next step after a complainant made a prima facie case of job discrimination. The Court declared that the burden which shifted to the employer was "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The [employer] need not persuade the court that it was actually motivated by the proffered reasons." 450 U.S. at 254. When this court in *Woods* "accept[ed] and embrace[d] the rules stated in *Burdine,*" it was adopting the *McDonnell Douglas* "tripartite allocation of evidentiary production." The lengthy passage from *Burdine* which is set forth in *Woods* begins and ends with citations to *McDonnell Douglas.* 231 Kan. at 766-67.

In many if not most employment discrimination cases, the plaintiff is unable to present direct evidence of discriminatory motive. Thus, general discussions of the evidentiary scheme for em-

ployment discrimination cases tend to revolve around *McDonnell Douglas* and *Burdine*. *Woods* is such a case. In a footnote in *McDonnell Douglas,* however, the United States Supreme Court stated: "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n.13. In *Teamsters v. United States*, 431 U.S. 324, 358, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977), the Court expressly rejected the contention that it had "create[d] an inflexible formulation" in *McDonnell Douglas*. We find no reason to assume that when this court adopted the formulation of *McDonnell Douglas* in a typical case lacking direct evidence of discriminatory motive, it was not precluding the application of variations on that formulation when varying facts warrant it.

Wagher contends that she presented direct evidence that Guy's Foods acted with discriminatory motive. In *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990), the Court of Appeals defined direct evidence as evidence which "relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." 904 F.2d at 1555. We agree. In the present case, Wagher presented two witnesses who testified that John Kenna, the district general manager, did not hire her because she was a woman. Tilford testified that Kenna asked if Wagher's September application was a joke and put it in the trash the day it was submitted. Tilford testified that Wagher's December application was denied by Kenna "[b]ecause she was a female." Dennis Wagher testified about talking to Kenna in September 1988 about Deborah Wagher's applying for a route sales driver job. Kenna said, " 'I'm surprised she didn't apply for the secretarial job.' " When Dennis Wagher responded that she enjoyed route work, Kenna said, " 'Well, I don't hire women.' "

Wagher further contends that her direct evidence creates a presumption of unlawful discrimination. In a footnote to *Jones v. Gerwens,* 874 F.2d 1534, 1539 n.8 (11th Cir. 1989), the following explanation of the altered proof scheme is given:

"Once the plaintiff in a Title VII case presents direct evidence that the employer acted with discriminatory motive, the employer can rebut the presumption of

discrimination only by proving by a preponderance of the evidence that the same decision would have been reached in the absence of the discriminatory motive. See *Price Waterhouse v. Hopkins*, [490] U.S. [228], 109 S. Ct. 1775, 1804, 104 L. Ed. 2d 268 (1989) (opinion of O'Connor, J., concurring in the judgment) ('in order to justify shifting the burden on the issue of causation to the defendant, a disparate treatment plaintiff must show by direct evidence that an illegitimate criterion was a substantial factor in the decision. . . . Where a disparate treatment plaintiff has made such a showing, the burden then rests with the employer to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor'); *Thompkins v. Morris Brown College*, 752 F.2d 558, 563 (11th Cir. 1985). *Cf. Price Waterhouse*, [490] U.S. at [258], 109 S. Ct. at 1795 (plurality opinion) ('when a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account')."

In the present case, Wagher presented direct evidence that her gender played a motivating part in the decision of Kenna not to hire her for a route sales driver job. Thus, applying the *Price Waterhouse* allocation of proof, Guy's Foods' contention that Wagher failed to establish a prima facie case is unfounded. Even applying the *McDonnell Douglas* formulation, Wagher met her initial burden of establishing a prima facie case of discrimination by showing (i) that she is female; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that despite her qualifications, she was rejected; and (iv) that after her rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications.

Focusing on this last point, Guy's Foods adamantly argues that Wagher failed to establish a prima facie case because the evidence showed that it hired applicants who were more qualified than Wagher. Guy's Foods states that the only person it hired in the fall of 1988 as a route sales driver was Phil White and that he was more qualified than Wagher because he had route sales experience. It mentions in addition to Phil White, who applied in September 1988, several men who were hired during 1989 "from the December 1988 applicant pool." Guy's Foods' point seems not to be well taken. Its argument is premised not on the initial

burden of establishing a prima facie case of discrimination but on the ultimate burden of demonstrating discrimination by a preponderance of the evidence. There is no question that route sales drivers continued to be sought after Wagher was rejected. Moreover, Wagher argues that, if a prima facie showing requires comparison of applicants' qualifications, her extensive experience assisting Guy's Foods' route sales drivers compares favorably with White's experience with an exterminator and a cleaning products concern. She points out that White had no experience on a food route and that Dale Tilford testified that White's experience did not qualify him for the job of route sales driver with Guy's Foods. Tilford testified that White "didn't even know what a route truck looked like." We find no merit in Guy's Foods' argument and find that Wagher established a prima facie case of employment discrimination.

Guy's Foods next contends that as a matter of law, Wagher was entitled to no back or front pay due to her failure to mitigate her damages. It relies on *Woods v. Midwest Conveyor Co.*, 236 Kan. 734, 739, 697 P.2d 52 (1985) (*Woods II*), for the proposition that Wagher's duty to mitigate damages required her to be " 'reasonably and continually seeking and accepting comparable work and benefits.' " Guy's Foods contends that there is no evidence that Wagher ever sought comparable work and benefits.

Wagher responds that whether and to what extent she mitigated damages was a fact question which the district court properly submitted to the jury. On the Special Verdict Form, the jurors supplied the figure $31,200 for "less mitigation amounts, if any are applicable," which was subtracted from "back pay from the date of discrimination to date of trial." Back pay of $82,000 was reduced to $47,700 by "mitigation amounts" and amounts which would not have been earned due to Wagher's unavailability for work. Wagher also argues that failure to mitigate damages is a defense for which Guy's Foods bore the burden of proof and that it presented no evidence of comparable route sales driver openings or earnings which would have been obtained in such positions. Wagher testified about other types of employment for which she applied.

Turning to *Woods II*, one finds that the language quoted by Guy's Foods is that of the district court rather than this court. 236 Kan. at 739. The determinations of the district court are introduced by the following declaration by this court: "An employee improperly discharged because of discrimination is entitled to receive the back pay including raises he would have received but for the illegal termination, less wages earned in mitigation. See 2 Larson on Employment Discrimination §§ 55.23 and 55.37 (1982)." 236 Kan. at 738-39. There is nothing expressed in this court's statement which details how, or even if, the plaintiff is required to mitigate damages. The language quoted by Guy's Foods is from one sentence in a rather lengthy account of what Woods would have been paid but for the discriminatory termination. The district court stated: "Complainant met his duty to mitigate his damages by reasonably and continually seeking and accepting comparable work and benefits." 236 Kan. at 739. This court stated:

"The record adequately supports Woods' claim for damages with proper mitigation and efforts to mitigate, stated as follows by the trial court:

'Ultimately to survive, he [Woods] was forced to seek and accept welfare, food stamps, and emergency energy assistance. (Amounts received from welfare and public assistance programs are not compensation or wages which must be considered to offset interim wage loss, so the amounts he received from such programs is irrelevant to a computation of net interim wage loss. Also, while the duty to mitigate wage loss does not require seeking welfare-type assistance, the fact is that Woods left no stone unturned in his efforts to survive his discriminatory discharge.)'

"We conclude the findings of fact of the trial court are supported by substantial competent evidence and therefore will not be disturbed on appeal." 236 Kan. at 742.

In the present case, the district court instructed the jury as follows:

"[B]ack pay must be reduced by any amounts you find that plaintiff earned or could have earned by reasonable efforts from the date of discrimination to the date of trial.

"In considering what plaintiff could have earned by reasonable efforts, you must consider the following:

1) whether plaintiff reasonably and continually sought and accepted comparable work and benefits;

2) whether defendant offered plaintiff the same or a substantially equivalent job when it offered her a job as a relief driver; obligating her to accept the position to mitigate her damages;

3) whether plaintiff sought and accepted employment consistent with her skills, background, and experience, not involving conditions that are substantially more onerous than the position sought.

4) whether plaintiff would not have received any compensation due to any period of her unavailability for work.

"Defendant has the burden to prove by a preponderance of the evidence that plaintiff failed to mitigate her damages and by what amount."

Larson's treatise on employment discrimination, which was cited by the court in *Woods II*, contains the following discussion of a defendant's burden to prove that a plaintiff failed to mitigate damages:

"When the defendant seeks to mitigate the plaintiff's damages and reduce the back pay award by amounts a reasonably diligent plaintiff *could* have earned, the burden lies on the defendant to prove the deduction. First, the defendant must show that there were substantially equivalent positions available for the plaintiff to take during the period in which the defendant caused him to be out of work. Second, it must be shown that the plaintiff did not exercise reasonable care and diligence in seeking such positions [citing *Gaddy v. Abex Corp.*, 884 F.2d 312, 50 F.E.P. 1333 (7th Cir. 1989), *reh'g denied* (Oct. 16, 1989). The defendant had to do more than assert that the plaintiff did not follow up on a job lead with another company: it had the burden to prove that if the plaintiff had pursued the lead, there was 'a reasonable probability' that she would have received a job offer.] In *Lowry v. Whitaker Cable Corp.*, [348 F. Supp. 202 (W.D. Mo. 1972), *aff'd* 472 F.2d 1210 (8th Cir. 1973),] the court refused to accept the employer's contention that the discriminatorily discharged plaintiff's back pay award should have been reduced by more than her actual earnings at four interim and temporary jobs. The plaintiff had voluntarily quit each of the jobs, and had even gone to a manpower training school for two months. But the court asserted that:

'There has been no showing under the statute that any other awards were "earnable with reasonable diligence." Plaintiff had a right to continue a search for permanent, equivalent employment. It does not appear, as defendant asserts, that any of the post-discharge employments were meant to be permanent. Normally, in awarding damages for a breach of contract of employment, it is only required that the non-defaulting party act reasonably so that he does not enhance damages. "To the extent that the non-defaulting party has not acted reasonably and has thereby failed to avoid certain consequences which are now claimed as damages, the party who is in default may show those consequences in reduction

of damages." . . . No evidence of unreasonable conduct after the discharge by defendant appears in this case.'

. . . .

"The 'other employment' which the plaintiff should have sought or accepted need not be exactly like the employment denied by the defendant. The plaintiff's seeking or accepting or failing to seek or accept other employment will not be seen as a failure to mitigate damages if the court finds the plaintiff's action reasonable." 2 Larson on Employment Discrimination § 55.37(c), 11-96.81-.83, .85-.86 (1994).

In support of its position, Guy's Foods included a section headed "Mitigation Issues" in the statement of facts in its brief. The subject of the first paragraph of that section is employment with other companies. Guy's Foods asserts that Wagher "did not look for other work as a route sales driver, although there are many route sales companies in Wichita." There is no record reference for the assertion. Guy's Foods asserts that she did not seek work as an LPN or scanning coordinator, types of employment she had held before applying at Guy's Foods. Guy's Foods references Wagher's answer to a question about what efforts she had made to find employment after December 1988. Wagher testified, "Before Adrian was born, just some cashier jobs," and she added that she had gotten a cashier job with Dillon's. Wagher's baby was born January 2, 1992. Trial took place in July 1992. Guy's Foods refers to Dennis Wagher's testimony that his wife worked as a checker at Dillon's in 1990, made $541, and "quit because it was boring to her." Deborah Wagher's testimony confirmed that the job was boring because business at the store was slow, but she testified that she left "[b]ecause it was costing more to work than what I was making." Guy's Foods asserts that Wagher "applied for only a few jobs" between December 1988 and trial in July 1992." The first record reference is to Wagher's testimony about working for Skaggs for a few months in 1991 and leaving the job due to marital problems, including a three-month separation from her husband, and working for Dillon's. Wagher was not asked what jobs she applied for after December 1988. The second record reference is to Wagher's testimony that she did not apply for nursing jobs after December 1988.

Guy's Foods does acknowledge evidence of Wagher's seeking employment. The evidence, however, is presented as "conflicting." Guy's Foods states:

"Plaintiff's testimony as to her efforts to find employment between September 1988 and July 1992 was conflicting: claimed applied at Checkers and did not get job in 1989, and **says only applied for that job and one other as checker and admitted did not look for any other work**; later claimed applied for Pepsi accounts manager in 1991, (though no evidence she is qualified), and Seven-Up for part-time weekend merchandising in 1991. Testified worked as cashier at Skaggs February 1988; later said no and claimed it was 1991; then admitted 1988."

The first record reference is to a 1990 W-2 tax form for Wagher from Dillon Companies, Inc., showing wages of $541.35. The second is to the following questions and answers of Wagher:

"Q. Okay. So then you did—was it after—was it still in 1988 when you applied for the job at Checkers where you didn't get hired then?
"A. No, it wasn't.
"Q. Was that in 1989?
"A. I believe it was.
"Q. Okay. When you applied for that job at Checkers, did you apply for any other grocery store jobs?
"A. No.
"Q. Well, you did get a part time cashier job later at Dillons; is that right?
"A. Yes.
"Q. So you eventually applied one more time for a cashier's job, I guess?
"A. Yes.
"Q. Is that the only other cashier's job that you applied for?
"A. Yes.
"Q. And then after that, you didn't look for any other work, did you?
"A. No."

The third reference is to Wagher's testimony that she applied at Pepsi for an accounts manager position in 1991 and that she applied at Seven-Up for a weekend merchandising position approximately a year before trial. Finally, Guy's Foods notes that confusion about when Wagher was employed by Skaggs was resolved in favor of 1988.

Although Guy's Foods' counsel elicited testimony about other products which are distributed through route sales, nothing in the portions of the record which has been brought to the court's at-

tention constitutes a showing by Guy's Foods "that there were substantially equivalent positions available for the plaintiff to take during the period in which the defendant caused [her] to be out of work." Nor can it be said that Guy's Foods showed that there was any reasonable probability that Wagher would have received a job offer if she had applied for other route sales driver jobs. In this respect, Guy's Foods' insistence that it would not hire her because she was not qualified, even though she had actively participated in the route sales distribution of Guy's Foods products in the geographical area, probably tended to weaken its case for requiring her to seek employment with a company with whose products she had no experience. Wagher contends that Guy's Foods should have produced evidence of the availability of route sales driver openings, but that it did not. According to Wagher, the jury's reduction of her back pay award by more than $30,000 was "exceedingly generous toward Guy's." The portions of the trial transcript which were referenced by Guy's Foods as evidence on this issue tend to support Wagher's position that evidence of available jobs comparable to the Guy's Foods route sales driver job was not presented.

In December 1989 or January 1990, Guy's Foods offered Wagher a relief route sales driver job. Guy's Foods contends that the relief job was substantially equivalent to the route sales driver job; Wagher argues that it was not. Guy's Foods contends that "[t]he only difference between the two positions is that the relief route sales job may require some out-of-town travel within the Wichita region." Guy's Foods characterizes this difference as a matter of convenience rather than job content.

The relief route sales driver substitutes for vacationing, ill, or absent route drivers. Relief drivers fill vacancies created when regular route sales drivers terminate before a replacement is available. Dennis Wagher testified that he worked as a relief driver for approximately six months, and during that time there were 15-20 days when he was assigned to tasks other than driving a route. Using a figure of 130 working days for six months (26 × 5 = 130), a relief driver would not be driving approximately 15% of the time if Dennis Wagher's experience is typical. Nondriving

days would be spent at the warehouse doing jobs like reorganizing the storage bins and cleaning up the dock. At the time Deborah Wagher was offered a relief job, it paid $325 per week with a $25 increase after three months and another $25 increase after six months. Guy's Foods asserts that the annual salary would be $19,300. Calculating 13 weeks at $325, 13 weeks at $350, and 26 weeks at $400, the annual salary would be $19,175. Route sales drivers are paid $109.75 per week plus a percentage of sales. For Dennis Wagher, the salary plus commission compensation for 1989 totaled $23,610.73; for 1990 it totaled $22,232.39; for 1991 it totaled $27,020.60. With regard to where the work is performed, John Kenna's successor testified that relief drivers "may be out [of town] for a month at a time. They can come back home on weekends." Dale Tilford testified that when he was a relief driver, he was assigned to a route in Pratt for eight months and he returned home to Wichita only on weekends. There was testimony to the effect that what Guy's Foods has argued is the most important aspect of the route sales driver job, sales development, tends not to be a responsibility of the relief job. Dennis Wagher testified that as a relief driver, he made very few sales calls when substituting for a short term and concentrated on maintaining the route's status quo for the regular driver.

In support of her contention that the relief position was not substantially equivalent to the route sales driver position, Wagher quotes the following:

"We hold that the substantial equivalent of the position from which the claimant was discriminatorily terminated must afford the claimant virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status. See *Ford Motor Co.*, 102 S. Ct. at 3065 ('Although the un- or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied.'); *McCann Steel Co. v. NLRB*, 570 F.2d 652, 655 (6th Cir. 1978) ('We believe that substantially equivalent employment refers to the hours worked . . . as well as the nature of the work there.'); [citations omitted]." *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983).

She contends that the relief job does not afford compensation, job responsibilities, working conditions, or status virtually identical

to the route sales driver job, and the evidence tends to bear her out.

Guy's Foods compresses the questions of back pay liability and substantially equivalent employment. It relies on *Ford Motor Co. v. EEOC*, 458 U.S. 219, 73 L. Ed. 2d 721, 102 S. Ct. 3057 (1982), for the proposition that its offer of a substantially equivalent job cuts off back pay liability. Guy's Foods also relies on *Ford* for the test for substantial equivalence. *Ford* involved the employer's offer of the job which previously had been denied, not some other job. The issue was whether retroactive seniority had to be awarded in order to toll the continuing accrual of back pay liability. We do not find support for Guy's Foods' position in *Ford*.

Guy's Foods also places particular reliance on *Cowen v. Standard Brands, Inc.*, 572 F. Supp. 1576; 1581-82 (N.D. Ala. 1983). It urges that "the *Cowen* rule should be adopted for *Ford* questions under the KAAD, and the issue of what is a 'substantially equivalent' job should be held to be a question of law for the court." Cowen was a 59-year-old salesman who was terminated by Standard Brands and then, before he suffered any lost income, was offered a comparable position in another state with no reduction in compensation and moving costs borne by the employer. 572 F. Supp. at 1577-78, 1581. Cowen sued under the Age Discrimination in Employment Act, and Standard Brands asserted as a defense that Cowen's termination was incident to a reorganization of its sales force. 572 F. Supp. at 1577. Cowen turned down the offer, stating "that his feelings were hurt and that he did not feel that the offer was bona fide." 572 F. Supp. at 1581. The federal district court stated:

"Neither of these reasons is recognized as an excuse in *Ford Motor Co. v. EEOC*, which clearly expresses the view of the Supreme Court that an employer can cut off all claims of a terminated employee for back pay by unconditionally offering the employee a job comparable to the job from which he was terminated. While *Ford Motor* was a Title VII case and not an ADEA case, the following rationale applies equally to ADEA cases:

'The "primary objective" of Title VII is to bring employment discrimination to an end [citation omitted], by "'achiev[ing] equality of employment opportunities and remov[ing] barriers that have operated in the past to favor an identifiable group . . . over other employees.'" [Citations omitted.]

"[T]he preferred means for achieving" this goal is through "[c]ooperation and voluntary compliance." [Citation omitted.]

The Supreme Court continued:

'The rule tolling the further accrual of backpay liability if the defendant offers the claimant the job originally sought well serves the objective of ending discrimination through voluntary compliance, for it gives an employer a strong incentive to hire the Title VII claimant.' [458 U.S. at 228-29.]" 572 F. Supp. at 1581.

The complainant in *Cowen* was offered the job from which he previously had been fired, but in a different location. Because Cowen would have been subject to transfer if he had remained employed by Standard Brands, the offer for re-employment being conditioned on transfer did not disqualify the offer from cutting off back pay liability. Guy's Foods would have the court adopt the rule that the location of an offered job is irrelevant to the question whether it is substantially equivalent to the job sought or lost by the complainant. We find that to be an unwarranted expansion of the scope of the court's ruling in *Cowen*.

Guy's Foods wants the court to hold that it is a question of law whether an offered job is substantially equivalent to one lost or sought. Such a holding is incongruous with this court's typical view of what constitutes questions of law and fact. In the area of negligence, for example, this court holds that "[w]hether a duty exists is a question of law [citations omitted]. Whether the duty has been breached is a question of fact. [Citation omitted.] Further, whether there is a causal connection between the breached duty and the injuries sustained is also a question of fact. [Citation omitted.]" *Durflinger v. Artiles,* 234 Kan. 484, 488, 673 P.2d 86 (1983). In this formulation, whether the duty has been breached is a question of fact because it can be answered only by weighing the evidence. The same may be said of the causal connection, but the duty is a principle which exists independent of the individual facts of a case. Whether an offered job is substantially equivalent to one lost or sought does not seem susceptible to being packaged as a principle. In this case, evidence of the salient features of the offered job and the sought job need to be weighed and

compared in order to reach a determination. Moreover, if what Guy's Foods intended to argue was that in the circumstances of the present case, the question should have been taken from the jury because the evidence could lead to only one conclusion, the argument is misconceived. The evidence in the present case discloses both similarities and differences between the offered and sought jobs. The question is one of fact for the jury to determine.

The jury awarded Wagher $27,000 in front pay, and the district court entered judgment in that amount. The following is an explanation of front pay:

" 'Front pay' is a monetary award that compensates victims of discrimination for lost employment extending beyond the date of the remedial order. Front pay is considered the equitable equivalent of reinstatement and it is awarded in two situations: first, when reinstatement cannot occur immediately because of the temporary lack of availability of a position or the undesirability of 'bumping' another employee; and second, when the remedy of reinstatement is simply not appropriate, usually because of the hostility that has developed between the parties." 2 Larson on Employment Discrimination § 55.39, 11-96.121.

In this case, the jury was instructed as follows on the subject of front pay:

"You may order front pay according to your own discretion. Front pay may be awarded if reinstatement is not feasible either due to hostility between the parties or when a suitable position is not available. Front pay is intended to compensate the plaintiff for a reasonable period in the future in which to obtain suitable employment, including lost earnings that are reasonably likely to occur."

K.S.A. 44-1005(k) provides for "affirmative action, including but not limited to the hiring, reinstatement, or upgrading of employees, with or without back pay, and the admission or restoration to membership in any respondent labor organizations," as well as an award of damages for pain, suffering, or humiliation. Guy's Foods does not dispute that the scope of the KAAD's remedy provision is broad enough to include front pay. Guy's Foods argues instead that front pay should not have been awarded in the circumstances of the present case. Wagher counters that both reasons why awards of front pay are made are present in her case.

First, she asserts that Guy's Foods "simply did not have a substantially equivalent position available in which to place" her. Guy's Foods does not directly contradict this assertion, and the jury seems to have rejected Guy's Foods' position that the relief job was the substantial equivalent of the route sales driver job. Guy's Foods argues, however, that Wagher's refusing to accept its offer of the relief job demonstrates that front pay is inappropriate because she is not available and willing to work. Put another way, Guy's Foods argument is that front pay is intended to make up for the difference between the salary she would have received as a route sales driver and the salary she was receiving as a relief driver because of the lack of availability of route sales driver jobs. Because Wagher refused its offer of a relief job, the argument continues, she is not entitled to an award of front pay.

The $27,000 awarded to Wagher approximates Dennis Wagher's income in 1991 as a route sales driver. One might assume that the jury considered one year to be "a reasonable period in the future" in which Deborah Wagher might obtain "suitable employment." Because Wagher had no salary, the difference between the salary she would have received as a route sales driver and the salary she was receiving was fixed at $27,000. If she had accepted the relief job so that her salary was approximately $19,000, the difference would have been significantly reduced. In this light, Guy's Foods' argument as to the inappropriateness of front pay in the present circumstances bears serious consideration.

The case relied on by Wagher tends to underline the distinctions between an appropriate case for an award of front pay and the present case. She cites *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976), which Larson calls "[t]he leading case of the first kind [when reinstatement cannot occur immediately]." 2 Larson on Employment Discrimination § 55.39, 11-96.121. *Patterson* is a class action in which a remedy for widespread racially discriminatory employment practices had to be designed which would make victims whole without displacing innocent incumbents. For victims "unable to move

immediately into jobs to which their seniority and ability entitle them," awards which have come to be called "front pay" were fashioned. See 535 F.2d at 268-69.

Second, Wagher defends the award of front pay on the ground that the hostility which had developed between her and Guy's Foods as a result of this litigation practically precluded her working for the company. Her evidence of hostility consisted of John Kenna's prejudice against women and her being asked to stop helping her husband on his route. There also was evidence that Kenna had been replaced, and, for requesting Wagher to stop assisting her husband, Guy's Foods offered as an explanation the reduction of insurance liability risk and "control of the appearance and actions of company representatives."

Again, the case relied on by Wagher detracts from rather than enhances her position. *E.E.O.C. (U.S.A.) v. Pacific Press Pub. Ass'n,* 482 F. Supp. 1291 (N.D. Cal. 1979), involved the confrontation between the government and the Seventh-Day Adventist Church over alleged employment discrimination and the confrontation between the church and one of its members, the complainant. She worked for the publishing affiliate of the church, which maintained a system of disparate compensation based on gender. When she filed her charges of discrimination, she was terminated and disciplined by her church. In pondering the appropriateness of an award of front pay, the district court stated:

"There is no doubt that reinstatement is an inappropriate remedy in this case. The antagonism that has been generated by the litigation and the likelihood that the litigation will not end with the issuance of this opinion force this conclusion. In instances in which it has been decided that an effective employment relationship could not be reestablished, the courts have excluded reinstatement from the forms of relief granted a successful Title VII plaintiff." 482 F. Supp. at 1320.

Comparable circumstances have not been shown in the present case. Wagher was not employed by Guy's Foods; therefore, the question of reinstatement or reestablishing employment was not at issue. The district court erred in not granting Guy's

Foods' motion for judgment notwithstanding the verdict as to the jury's award for front pay. The judgment of the district court as to front pay in the amount of $27,000 must be reversed, and the judgment in all other respects is affirmed.

Affirmed in part and reversed in part.